[No. B071649. Second Dist., Div. Seven. Sept. 21, 1994.]

THE PEOPLE, Plaintiff and Respondent, v.
DANNY LAVEL BROWN, Defendant and Appellant.

592

## COUNSEL

Charles Earl Lloyd and Anslyene A. Abraham for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Carol Wendelin Pollack, Assistant Attorney General, Kenneth C. Byrne and Donald J. Oeser, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**LILLIE, P. J.**—Danny Lavel Brown appeals from judgment entered following a jury trial in which he was convicted of three counts of kidnapping (Pen. Code, § 207, subd. (a)), nine counts of forcible rape (Pen. Code, § 261, subd. (a)(2)), one count of sodomy with a child under fourteen years of age with "ten years difference" (Pen. Code, § 286, subd. (c)) and one count of forcible lewd act upon a child (Pen. Code, § 288, subd. (b).) As to the kidnapping charges, the jury found that the kidnapping in one count was for the purpose of committing rape pursuant to Penal Code section 208, subdivision (d), and the kidnapping in the remaining two counts was a kidnapping of a person under fourteen years of age pursuant to Penal Code section 208, subdivision (b). On appeal he contends the court committed reversible error in allowing a witness to be examined regarding gang affiliation, abused its discretion by denying the defense a continuance and committed sentencing and instructional errors.

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

On March 29, 1991, after taking a bus to 8th Avenue, 15-year-old Ingrid F. was walking to Mount Vernon Junior High school when she passed defendant going in the opposite direction. Defendant grabbed her from behind, told her not to say anything or move, and that he would break her neck if she screamed. Defendant told her to "act like if [she] was his friend, so nobody else would know" and they walked to 23rd street. Defendant held her arm and she was scared.

Defendant asked F. if she knew "this guy named Markco from 18th Street. It's a gang. And [F.] said that [she] didn't know anything about gang members. Then [defendant] told [F.] that he had a girlfriend named Maria. And [F.] asked him how old was this guy, and he said 18. Then [F.] said he couldn't be going to Mount Vernon."

F. later testified, in response to the prosecution's question, "What else did [defendant] say to you, if anything while you were walking?" that defendant said he was looking for Markco because he shot his "buddy."[1]

Defendant told F. he was going to show her his friend's house that was nearby. When F. said she wanted to go to school, defendant said he would let her know when she could go. F. walked with defendant for a long time, looking for his friend's house. It seemed like defendant was lost.

Defendant took F. into an alley and said his friend lived there. Defendant put F. against a car and while behind her, pulled down her jeans and underwear and forced her on her hands and knees, threatening to break her neck. F. cried and told him not to do it. When she looked back to see him, he grabbed her head and told her not to look at him. Defendant raped F. and said if he heard "someone like the police was looking for him" he was going to do something to her; he was going to shoot her and he knew where she lived.

F. did not go to school that day and did not return to school until approximately April 11, at which time she told the dean and the school police what had happened. She went to a clinic the day she returned to school.

Approximately two weeks later, she was shown a series of photographs and stated one photograph was of a man who looked like the man who raped her, but she was not sure.

---

[1]Defendant's objection on relevancy grounds was overruled, following the prosecution's argument that the evidence was relevant to show fear, which was an element of the kidnapping charge.

At a later time, F. was shown another group of photographs and identified one as the person who raped her. She signed a photo identification report and wrote she was sure of the identification.

On the morning of April 17, 1991, while 13-year-old Jamie S. walked from her home on 8th Avenue, near Adams, to the bus stop, defendant approached her and asked for directions. S. was not able to direct defendant and kept walking. Defendant grabbed S. from behind, covered her mouth with his hands, and told her, "Cooperate. And it will be easier if you cooperate. Don't yell or I'll kill you." Defendant removed his hands from S.'s mouth and they walked towards 23rd Street; he asked S. her name and other questions. S. was afraid defendant was going to hurt her.

Defendant took S. to the back of an apartment, where there were three cars, and told her to face one of them. When S. turned around to look at defendant, he told her not to look at him and to cover her eyes, which she did.

They then walked down the street to an area under a staircase in another apartment building. S. screamed twice and defendant picked her up and got her "back there." Defendant threatened to kill S. if she didn't "shut up," forced her to get on her hands and knees, and raped her. Defendant's penis kept coming out because S. was moving and defendant was hurting her; he told her to stop moving or he would kill her and put his penis back inside her vagina around eight or nine times. Each time S. struggled, defendant's penis would come out of her vagina. One time he tried to put his penis in her "butt." S. felt it in her "butt" and defendant took it out and put it back in her vagina; at that time defendant went all of the way in.

Defendant pulled his penis out when he heard footsteps. A woman came down and asked, "Whose bags are these?" While defendant and S. were under the staircase, a man hollered down and asked what they were doing. Defendant answered, it was none of his business. The man asked defendant and S. their names; defendant said his name was Peter and S.'s name was Janet. When defendant let S. go, he told her if she told anyone what had happened, he would kill her and her whole family and he knew where she lived.

On April 17, Floyd Ray Frazier lived in an apartment on West 25th street; around 7:30 a.m. he was awakened by some noise outside of his apartment. Upon investigating, he saw defendant and a female under the staircase engaged in sexual intercourse. The female was on her hands and knees.

On April 17, Los Angeles Police Officer Kris Kalis interviewed S. at her home. S. was taken to Cedars-Sinai Hospital and examined. Kalis signed a

medical report regarding a suspected sexual assault, authorizing the examining doctor to collect evidence. Kalis picked up the evidence that same day and booked it at southwest police station. The evidence consisted of debris, pubic combings, dried secretions, vaginal swab, vaginal aspirate, blood and saliva, pubic hairs, panties, bra, t-shirt, halter top and shorts.

On April 17, Patsy Ross, a licensed vocational nurse, was assigned to the Cedars-Sinai emergency room. Ross was present when S. was examined by Dr. Eugene Keller. Keller collected evidence from S., and Ross received the evidence from Keller and then packaged the samples in envelopes included in the "rape kit."

On April 18, S. met with Detective Charlene Laughton, who showed her a book of photographs. S. picked out a photograph of a person that looked like the man who attacked her, but she was not sure.

On April 25, Laughton showed S. a series of six pictures and asked her to look at them very carefully and see if she could identify the man who attacked her. S. dropped the photographs down, ran to her grandmother and said, "that's him." S. signed a photo identification record and wrote, "Number 2 is the man that messed with me. I'm sure." Defendant was depicted in this photograph.

Collin Yamauchi is a criminalist employed by the Los Angeles police department. He analyzed evidence taken from S. which revealed evidence of spermatozoa on the vaginal swab and in the vaginal aspirate; semen was detected on the two vaginal swabs and on S.'s panties. Also microscopic material consisting of spermatozoan fragments were detected on the secretions in the rectal/oral envelope.

On April 23, 1991, 13-year-old Nadine M. was walking on 3rd Avenue to Mount Vernon Junior High when she saw defendant walking behind her. When she turned around, defendant grabbed her mouth and told her not to scream. Defendant walked her across the street, and walked for about five to ten minutes, keeping his hand on her shoulder, to the side of an apartment building and told her to sit down. Defendant put gray tape on M.'s eyes and mouth; she took it off and threw it on the ground. Defendant told M. to bend over and put her hands on a wall, which she did. While standing behind M., defendant lifted up her skirt and then pulled her underpants down. Defendant was "feeling on [her] butt" then opened her bra and then "opened [her] butt." Defendant told M. to lie down on the concrete which she did. M. looked up and said, "There's a lady watching."

Defendant looked up and said he did not see anyone; he told M. to stand up and pull her underpants up and her skirt down, so M. did. When

defendant told M. to go to the back of the building, M. said she did not want to go back there. M. saw someone across the street, ran to him and said "this man is trying to rape me." M. went upstairs to a sewing factory where she eventually spoke with police.

Rodolfo Estrada was leaving his apartment at approximately 7 a.m. when M. came up to him and said defendant wanted to rape her. Estrada saw defendant run and enter a black Blazer automobile. Estrada memorized three numbers from the license plate and gave them to a detective.

On April 23, Los Angeles Police Officer Alfredo Delgado responded to Mount Vernon Junior High School and met with M. He went to the location where defendant attempted to rape M. and recovered three pieces of duct tape from that scene.

In April 1991, Lavon Chalk worked with the Los Angeles Unified School District Police Department and was assigned to Business Industry School. There were two other schools at that location, Arlington Elementary School and Mount Vernon Junior High School. On or about April 25, 1991, Los Angeles police officers showed him a field report with a description and a composite and asked Chalk if he had ever seen that person around the school sites. When Chalk saw the composite, he believed he knew the individual because the individual dated several girls at school, and he believed he had seen the person several months before. The individual had been driving a black "4 by 4" Blazer automobile. Chalk had spoken to the individual approximately 5 or 10 times and had seen the Blazer approximately 10 times. Chalk identified defendant as the driver of the Blazer vehicle.

Defendant was arrested on April 25, driving a black Blazer automobile.

*Defense*

Witnesses testified that during the time these crimes were committed, defendant was at other locations, taking his girlfriend's children to school.

Dr. Griffith Thomas testified he is a physician with a specialty in pathology. He reviewed the medical report concerning S. The history reflected that S. stated that her vagina and rectum had been penetrated by a penis, that the alleged perpetrator choked her and threatened her with harm, and that there was no consensual intercourse within the past 72 hours. The report indicated S.'s blood pressure was 100 over 180 or 70, which is a normal or slightly low blood pressure, which you would not expect for a person who had just been raped; her pulse was 88, which was also normal; the examining

physician wrote "no evidence of trauma" at the top and the middle part of the page which would mean there was no evidence of trauma; if the doctor had seen abrasions or a contusion of the neck, which is usually found when a person has been choked, one would expect the physician to make a notation of it. The report indicated there was no evidence of trauma in the anal and vaginal area. Assuming the victim was a 13-year-old girl and based on his review of the report, it was Dr. Thomas's medical opinion that the victim had not been penetrated in the vagina or in the anus; he testified that when Dr. Keller takes samples of fluids, he does not know about the presence or absence of spermatozoa; he does not know what the analysis is going to show.

I

*Evidence of Possible Gang Affiliation*

■ Appellant's contention that the court committed reversible error by allowing the prosecutor to examine F. regarding defendant's possible gang affiliation is without merit.

Apart from the fact that defendant failed to object to the admission of any evidence referring to gangs,[2] thereby waiving the issue on appeal (see *People v. Ghent* (1987) 43 Cal.3d 739, 766 [239 Cal.Rptr. 82, 739 P.2d 1250]), the record indicates that the prosecution's question did not seek to elicit evidence concerning gang affiliation by defendant. The evidence at most only indicated that Markco, the alleged shooter of defendant's "buddy," might have been a gang member.

II

*Request for Contiuance*

■ We reject appellant's contention that the court's denial of a motion for continuance prevented him from securing the testimony of the physician who examined S., thereby preventing appellant from presenting a meaningful defense.

"The granting or denial of a continuance during trial traditionally rests within the sound discretion of the trial judge. [Citations.] To establish good cause for a continuance, defendant had the burden of showing that he had exercised due diligence to secure the witness's attendance, that the witness's expected testimony was material and not cumulative, that the testimony could be obtained within a reasonable time, and that the facts to which the

---

[2]Defendant's objection went to F.'s statement as to why defendant was looking for Markco.

witness would testify could not otherwise be proven. [Citations.]" (*People* v. *Howard* (1992) 1 Cal.4th 1132, 1171 [5 Cal.Rptr.2d 268, 824 P.2d 1315].)

Contrary to appellant's assertion, the court did not abuse its discretion in denying the motion for continuance. The chain of custody for evidence taken from S. was established by the testimony of Nurse Ross who witnessed Dr. Keller's examination of S. and the collection of evidence. Additionally, defendant's witness, Dr. Thomas, reviewed the medical report prepared by Dr. Keller and testified the report indicated that the examining physician wrote "no evidence of trauma." Dr. Thomas testified it was his opinion based on his review of the medical records that the victim had not been penetrated in the vagina or in the anus. Additionally, while there may have been some misunderstanding regarding whether the prosecution had intended to subpoena Dr. Keller, defense counsel at no time attempted to subpoena Dr. Keller, which might have been prudent if counsel believed Keller to be an important witness.[3]

III

*Sentencing*

The trial court imposed the upper term of 11 years for count 3, the kidnapping of S.; the middle term of 8 years for count 13, the kidnapping of M.; and the middle term of 8 years for count 1, the kidnapping of F.; all consecutive to each other for a total of 27 years for the nonsex offenses. The court imposed the upper term of eight years for count 2, the rape of F. and stayed its execution; consecutive eight-year terms for each count of forcible rape of S. (counts 4 through 11) and the sodomy of S. (count 12); and the upper term of eight years for the forcible lewd act upon a child (count 14) involving M. for a total of one hundred seven years.

At the time of sentencing, the court stated as a factor in aggravation that defendant was on three grants of felony probation and that there were no factors in mitigation and that upper term was appropriate. Regarding its choice to sentence consecutive or concurrent and pursuant to Penal Code section 667.6 or pursuant to section 1170.1, the court stated that the case was "a parent's nightmare. They send their kid to school in the morning to go on the bus to school or to walk to school and the defendant who is obviously a

---

[3]The prosecution noted that defense counsel had come into the case late in the game, but previous counsel had known of Dr. Keller from day one, knew of his observations on the report wherein he found no evidence of trauma from day one.

The trial court responded that the records were available to defense counsel and "If you had a doctor that examined a sexual assault victim hours after the sexual assault and said there's no trauma, I am kind of surprised that the doctor wasn't under defense subpoena."

sexual predator on children takes them and assaults them. [¶] He's a danger to children. Without a doubt I think the victims and their families will never be the same for the rest of their lives. . . ." The court found, "Each count was a separate act of violence, some were against the same victim, the same time span, and they were separate acts and threats of violence against the victims. [¶] I find that the events were planned and premeditated. They were not impulsive. They were threats to kill . . . I believe one victim. . . . There was . . . some circumstantial evidence of stalking; that he chose the victims. [¶] The police officer from Mount Vernon Jr. High was there in court, and he said he saw the defendant around the school. There wasn't any evidence in the trial or otherwise presented as to why he would be there, and I think two of the victims went to Mount Vernon or at least one I can recall. So there's some evidence that he was picking out his prey. The victims were vulnerable. They were children. They were innocent. They were trusting. They were naive. They just didn't know how to handle this during the event. [¶] It was somewhat sophisticated. He had brought with him tape at least on one instance, duct tape. I think that the events involved a high degree of cruelty. [¶] Now, it's hard enough to raise children in an urban area without having something like this happen. It's hard to raise kids. There's a lot of things that are out there to harm them and when something like this occurs, it almost makes it impossible. [¶] I think the defendant has really ruined their chance of a normal childhood. Who knows what kind of a sex life these girls will have when they meet boyfriend's [sic] or get married. I think each penetration of them will last a lifetime. [¶] I think they were violated in person, spirit, in addition to their bodies being violated."

■ Appellant contends the court erred in not staying the consecutive sentences imposed with respect to the counts of kidnapping of M. and S., pursuant to Penal Code section 654. He claims the acts of walking the victims from their respective school routes to the locations where the rapes and attempted rape occurred had only one criminal objective, the rapes and attempted rape.

This contention is without merit. Penal Code section 667.6, subdivision (c), provides: "In lieu of the term provided in Section 1170.1, a full, separate, and consecutive term may be imposed for each violation of . . . paragraph (2), (3), or (7) of subdivision (a) of Section 261, . . . subdivision (b) of Section 288 . . . or of committing sodomy . . . in violation of Section 286 . . . by force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim . . . whether or not the crimes were committed during a single transaction." (See *People* v. *Hicks* (1993) 6 Cal.4th 784, 788-797 [25 Cal.Rptr.2d 469, 863 P.2d 714]; *People* v. *Anderson* (1990) 221 Cal.App.3d 331, 342-343 [270 Cal.Rptr. 516].) In *People* v.

*Hicks, supra,* 6 Cal.4th at page 787, the California Supreme Court concluded that Penal Code section 667.6, subdivision (c), created an exception to Penal Code section 654 so as to permit full-term consecutive sentences for enumerated offenses constituting separate acts committed during an "indivisible" or "single" transaction. (See also *People* v. *Andrus* (1990) 226 Cal.App.3d 73, 79 [276 Cal.Rptr. 30].)[4]

■ We also reject appellant's contention that he should be punished for only one count of rape upon S. and not eight counts. The record establishes that defendant's penis kept coming out of S.'s vagina because S. was moving and defendant was hurting her. Defendant put his penis back inside S.'s vagina eight or nine times and threatened to kill her if she did not stop moving. Here the defendant's repenetrations were clearly volitional, criminal and occasioned by separate acts of force and separately punishable by consecutive sentences. (See *People* v. *Hicks, supra,* 6 Cal.4th 784, 788; *People* v. *Harrison* (1989) 48 Cal.3d 321, 338 [256 Cal.Rptr. 401, 768 P.2d 1078].)

Contrary to the assertion of the dissent, the length of defendant's sentence does not depend on irrational or arbitrary factors unrelated to the violence of the sexual assault or the injury the victim suffered. S. testified that the penetrations were hurting her, that defendant threatened to kill her if she did not stop moving and that she struggled. The length of defendant's sentence was based on the number of violent, painful and degrading insertions of the defendant's penis coupled with the defendant's threat to kill his victim. Each time S. struggled and defendant's penis came out, he could have chosen to stop his attack on S. and have been convicted of and punished for fewer counts of rape.

The court has not sliced a single sexual assault into as many times as it takes for defendant to achieve a "secure insertion." A secure insertion is not required for the crime of rape. "The essential guilt of rape consists in the outrage to the person and feelings of the victim of the rape. Any sexual penetration, however slight, is sufficient to complete the crime." (Pen. Code, § 263.) "[P]rolonged or deep insertion, or emission or orgasm, is unnecessary to 'complete' the crime." (*People* v. *Harrison, supra,* 48 Cal.3d at p.

[4]Appellant's citation to *People* v. *Latimer* (1993) 5 Cal.4th 1203 [23 Cal.Rptr.2d 144, 858 P.2d 611], for the proposition that it was a violation of Penal Code section 654 to punish defendant for kidnapping as well as rape is not controlling. (Appellant actually cited the appellate court decision, but review was granted and the Supreme Court issued its opinion.) *People* v. *Latimer* did not discuss the question whether Penal Code section 667.6, subdivision (c), created an exception to Penal Code section 654. In the instant case, the trial court imposed full consecutive terms for the sexual offenses pursuant to Penal Code section 667.6, subdivision (c).

329.) As the California Supreme Court observed in *People* v. *Perez* (1979) 23 Cal.3d 545, 553 [153 Cal.Rptr. 40, 591 P.2d 63], a "defendant who attempts to achieve sexual gratification by committing a number of base criminal acts on his victim is substantially more culpable than a defendant who commits only one such act."

## IV

### *CALJIC No.* 2.90

Appellant's contention that the trial court erred when it instructed the jury regarding reasonable doubt pursuant to CALJIC No. 2.90 has been rejected in *Victor* v. *Nebraska* (1994) __ U.S. __ [127 L.Ed.2d 583, 114 S.Ct. 1239], filed March 22, 1994.

### DISPOSITION

The judgment is affirmed.

Woods (Fred), J., concurred.

**JOHNSON, J.,** Concurring and Dissenting.—I concur with my colleagues as to most of the issues discussed in the majority opinion. I respectfully dissent, however, from that portion of the opinion imposing consecutive sentences for each of eight of appellant's penile thrusts during his single sexual assault on one of the victims, Jamie S.

Before explaining my reasons, I want to highlight what I am *not* arguing in this case. I am not saying appellant's crime was not terrible and deserving of severe punishment. Nor am I suggesting the total punishment imposed for appellant's rape of this victim would not have been justified if that were the sentence allowed for a single sexual assault of this nature. Furthermore, I am not concerned about the consecutive sentences imposed for different sexual acts against the same victim—e.g., the sodomy and the rape of Jamie S. —even though they occurred as part of the same transaction.

What bothers me instead is the way this sentence was compounded by treating eight thrusts of appellant's penis as separate crimes, each carrying a sentence of eight years, despite the fact these thrusts all occurred during a single act of forced intercourse. Fully 56 years of appellant's 107-year sentence represent the 7 additional sentences the trial court imposed for the 7 thrusts occurring after appellant first penetrated the victim's vagina and before he completed the sexual assault.

This case does not require me to reach the question of the constitutionality (under either equal protection or cruel and unusual punishment clauses) of Penal Code section 667.6[1] and its provision that as to certain sex crimes—and those only—trial judges may impose consecutive sentences for separate crimes even though they occur during the same transaction. My quarrel is not with the Legislature, but with the trial court's interpretation of the code provision the Legislature enacted and what that section allows courts to consider as separate crimes for purposes of sentence enhancement. In my view, this trial court stretched the statutory language beyond its intended meaning.

I do not think the Legislature intended the duration of a defendant's sentence to depend on irrational, arbitrary factors unrelated to the violence of the sexual assault, the quantity or severity of the injury the victim suffers, or the scope of the defendant's ambition. One defendant can apply enough brute force or make a credible enough threat (probably by brandishing a weapon) that the victim holds still and thus the defendant can complete the entire act of intercourse with a single initial entry. Even under this trial court's interpretation of section 667.6, this brutal or well-armed defendant receives a total eight-year sentence for the single completed act of forced intercourse.

The next defendant, however, is not very strong and is unarmed, as well. He is unable to force or threaten his victim enough. As a result, she flinches every time he attempts to enter her. So it takes "eight or nine" tries before he is able to insert his penis securely into the victim's vagina and complete this single act of rape. What does he get for his lack of strength and armament? As this trial court interprets section 667.6, he gets *64* years for this single completed act of coerced intercourse—8 times the sentence imposed on the larger, stronger or well-armed rapist for a similar single rape.

Does this make sense? I think not. Which defendant is more dangerous? Which inflicts the greater harm on the victim? Which exhibits the intention to commit the greater number of rapes on the victim? To the extent there is a difference, I submit it is the stronger or better armed rapist who poses the greater threat and is likely to inflict the greater harm on the victim.

Now, I realize life isn't always fair. Nor are sentencing decisions. But I think there are some limits to the unfairness the law will tolerate. In this case, a limit is placed on how finely a trial court can "slice" a single crime of rape into separate offenses in order to multiply the punishments it inflicts on the defendant.

---

[1]Unless otherwise indicated, all future references are to the Penal Code.

The majority relies primarily on *People* v. *Harrison* (1989) 48 Cal.3d 321 [256 Cal.Rptr. 401, 768 P.2d 1078] (cited with approval in *People* v. *Hicks* (1993) 6 Cal.4th 784, 788 [25 Cal.Rptr.2d 469, 863 P.2d 714]) for the proposition the trial court can slice this single sexual assault as many times as it takes for appellant to achieve a secure insertion and can inflict a separate punishment for each one of those slices. If it had taken appellant 100 thrusts before he managed to securely insert his penis, the trial court could have handed him an 800-year sentence.

I think *Harrison* is readily distinguished, however. In that case the prosecution charged the defendant with three sexual acts of inserting his fingers in the victim's vagina. The Supreme Court went out of its way to emphasize how these three incidents represented distinct and individual acts, the second and third constituting a resumption of the sexual assault after a "break in the activity" and accompanied by "intervening acts of force." As our high court recounted the attack(s) on the victim in *Harrison:*

"Virginia [the blind victim] immediately started to scream and raised her arms to protect her face. Defendant grasped her shoulders and began hitting her in the face and upper arms. He then reached inside her underwear and inserted his finger into her vagina. While he was doing so, Virginia continued to struggle and ended up standing on the bed. She eventually pulled away and dislodged defendant's finger, which had been in her vagina for four seconds.

"Virginia continued to scream and defendant continued to hit her. He then pushed her so that she was lying on the bed, and he was in a kneeling position beside her. He placed his hand over her mouth and again inserted his finger into her vagina. Meanwhile, Virginia pried defendant's hand away from her mouth, and he hit her in the face. She rolled to the other side of the bed, tried to kick defendant, and again dislodged his finger from her vagina. This second penetration lasted approximately five seconds.

"Virginia then stood up and started to run for the door. Defendant grabbed her by the hair, pulled her towards him, and punched her in the throat. He then inserted his finger into her vagina a third time. . . . The third penetration lasted approximately five seconds, . . ." (*People* v. *Harrison, supra,* 48 Cal.3d at pp. 325-326.)

The California Supreme Court held these three insertions represented three distinct acts of coerced sexual conduct and justified three separate consecutive sentences under section 667.6. The court emphasized defendant mounted three separate attacks on the victim. Each involved a decision to go

after the victim, in the second attack to force her into a new position on the bed and in the third to follow her to a new location and recapture her. In all three attacks, the defendant struck the victim and then overcome her resistance again before once again inserting his fingers in her vagina. So there were three separate struggles with the perpetrator and victim in different positions and at different locations, each culminating in a successful insertion of defendant's fingers into the victim's vagina.

True, the trial court considered each of these separate assaults as a separate offense and imposed a consecutive sentence on each. But the trial court did not treat any unsuccessful attempts at insertion which might have occurred during the three separate struggles as additional offenses justifying consecutive sentences.

In contrast, the instant case involves a single continuous—and eventually successful—attempt to rape this victim, rather than the three separate successful digital assaults the *Harrison* opinion describes.

The sole evidence about these "eight or nine" penal insertions came in the testimony of Jamie S., the thirteen-year-old victim. In this testimony, she first recounts how appellant, although unarmed, used threats to compel her to accompany him on a meandering walk which ended under some stairs in an apartment complex. The questioning continued:

"Q Then what happened, Jamie?

"A Then he told me to get on my hands and knees.

"Q Did you?

"A Yes.

"Q Where were your knees?

"A On the ground.

"Q Where were your hands?

"A On the ground.

"Q Where was he?

"A In the back of me.

"Q What did he do?

"A I turned around and I looked, and he was—he was—I turned around, and he was unbuttoning his pants.

"Q When you say you turned around, did your body remain in that position of all fours?

"A Yes.

"Q You saw him unbuttoning his pants?

"A Yes.

"Q What happened?

"A Then he got down.

"Q Was he behind you?

"A Yes.

"Q What happened, Jamie?

"A He *tried* to put it in me.

"Q When you say he *tried* to put it in you, could you feel his penis?

"A Yes.

"Q Where—What part of your body did you feel his penis?

"A In my private.

"Q Do you know the name for that private?

"A My vagina.

"Q Did his penis go inside your vagina?

"A It went in and kept coming out.

"Q Why did it keep coming out?

"A Because I was moving, and he was hurting me.

"Q Slow down. You said you felt his penis go inside your vagina?

"A Yes.

"Q Did it come out?

"A Yes.

"Q Then what happened?

"A He told me to stop moving or he'll kill me.

"Q Did his penis go back inside your vagina?

"A Yes.

"Q Can you—Did you keep moving?

"A Yes.

"Q Did his penis go outside your vagina?

"A Yes.

"Q Did he put his penis back inside your vagina?

"A Yes.

"Q Did you keep moving?

"A Yes.

[Leading question objection is made and overruled.]

"Q Did his penis go outside of your vagina?

"A Yes.

"Q Did he put his penis back inside your vagina?

"A Yes. He did it around eight or nine times.

"Q Each time you would struggle and his penis would leave your vagina?

"A Yes. Once he tried to put it in my butt.

"Q Did you feel it?

"A Yes

"Q Where exactly? Where did you feel it?

"A In my butt.

"Q Then what happened?

"A He took it out and he put it back in my vagina. And at that time he went all the way in.

"Q Please sit down. When his penis went inside your vagina that last time, what happened?

"Q He kept moving back and forth.

"A Did you feel anything?

"Q Hurt. He was hurting me." (Italics added.)

Later, during redirect examination the prosecutor elicited testimony underscoring the fact appellant and victim remained in the same position as well as at the same location during appellant's several unsuccessful attempts to successfully penetrate the victim.

"Q Now, Jamie, when you were being raped underneath the staircase on the morning of April 17th, did you and the defendant remain in exactly the same position during that entire time that you were there?

"A Yes."

There are striking contrasts between the sequence of events Jamie S. reports in this case and the facts the Supreme Court described in *Harrison*. Here the "eight or nine" attempted insertions all took place at the same location and in an uninterrupted sequence while perpetrator and victim remained in the exact same position. Moreover, in contrast with *Harrison*, none of these subsequent attempted insertions was accompanied by a new act of violence or a change of position or location.

These are the very factors the Supreme Court held were crucial to the outcome in *Harrison*. In announcing its holding as to what constitutes a separate crime, the high court said, "We *hold* that each of the digital penetrations committed in the course of defendant's assault upon Virginia N., *and highlighted by intervening acts of force*, constituted a separate

violation. . . ." (*People* v. *Harrison, supra,* 48 Cal.3d 321, 334, italics added.) Then, in announcing its holding on the issue whether these separate crimes could be punished with consecutive sentences, the Supreme Court said, "[T]here is no legal or logical bar to separate punishment where, as here, *each of defendant's 'repenetrations' was clearly volitional, criminal and occasioned by separate acts of force.* [Italics in original.] . . . Whether defendant ends a *break in the activity* by renewing the same sex act (as here) or by switching to a new one [citation], the result under section 654 is the same." (*Id.* at p. 338, italics added.)

In the instant case, there was no "break in the activity" as there was in *Harrison.* The victim did not break away from the perpetrator so that he had to decide whether to pursue her and "renew" or "resume" the activity. In this case, the activity was not renewed or resumed, because it had not been terminated or broken. Instead the activity was continuous at the same location and in the same position—from the first penetration until the eighth or ninth, and successful, one. Nor was there an "intervening act of force," the kind of beating, hair-pulling, and punching the Supreme Court stressed happened in *Harrison* after each break in the action when the perpetrator decided to renew or resume the activity. In the instant case, the only force involved was the normal thrust of appellant's penis attempting to penetrate the victim's vagina.

A "break in the action" affords the perpetrator the opportunity to rethink whether to renew his sexual attack. So there is some logic in viewing the renewed attack as a separate volitional act constituting a new crime and warranting separate punishment. Likewise if the renewal of the attack involves some new act of violence there is a logical reason to consider it a separate crime warranting separate punishment. But when, as here, there is no "break in the activity" the perpetrator has no occasion to make a new decision whether to resume the activity. The only "decision" is the ongoing decision to *continue* the activity, which is present during any continuous criminal activity of any significant duration and has never been thought to form the basis for a separate crime or punishment.

What happened here is a far cry from a situation where a defendant is in the middle of a successful act of coerced intercourse with a victim when she breaks free and flees to another part of the bed or another part of the room. He pursues, overcomes her again and forces his penis into her vagina a second time. And then she breaks free again, and the scenario is repeated again, and again, and again, and again, and again, and yet again. Eight separate rapes, eight separate uses of force or fear to overcome the victim's resistance at eight separate locations. Under *Harrison,* such a scenario

presumably would warrant eight consecutive sentences. But that kind of sentence is not warranted by eight unsuccessful attempts at a single successful insertion, all attempts taking place at a single location and during a single continuous process. Nothing in *Harrison* suggests it is.

The definition of the crime of rape states a "sexual penetration, however slight, is sufficient to complete the crime." (§ 263.) Thus, one might argue each unsuccessful attempt at effective insertion itself constitutes a separate act of rape, since presumably each involves a "slight penetration" of the victim's sexual organs. But this argument proves too much. (Or, one might even say it "penetrates too far.") The real question is: once there has been an initial penetration, slight as it might be, which is "sufficient to *complete the crime*," are subsequent penetrations which are part of the same sequence to be considered brand new crimes? Or are they to be considered a continuation of the already completed crime?

If one indeed is to consider each penile penetration a separate crime, there is no reason not to construe each penile thrust in a typical rape as a separate penetration and thus a separate act of rape (and thus separately punishable, according to the rationale of the majority). After all, each such thrust obviously involves a separate "sexual penetration, however slight" of the woman's sexual organs. Indeed at a microscopic level, each individual thrust will "penetrate" some new and different part of those organs. Thus, if we are to interpret section 263 as authorizing a consecutive sentence for each and every "sexual penetration," an ordinary rape will justify the piling on of scores and sometimes hundreds of consecutive eight-year sentences.

Yet no court has suggested section 667.6 can be interpreted to separately punish every penetration where the penetration begins inside the vagina, presumably because, as suggested above, all these penetrations are considered a part of a single crime. Similarly, there is no reason to separately punish every penetration which happens to begin outside the vagina, where it is part of a single sexual act. As section 263 says, the crime is "complete" when the initial "sexual penetration, however slight" occurs. The remaining penetrations—whether slight or deep, whether they begin outside the vagina or within—are simply a part of that already completed crime. As such, those penetrations of the victim's vagina, however few or numerous, should be punished as a single crime—not as a series of crimes.

It is not the depth or frequency of penetrations that determines the number of crimes of rape which have occurred. As section 263 itself explains, "The essential guilt of rape consists of the outrage to the person and feelings of the victim of the rape." That outrage and those feelings are experienced with

the initial coerced "sexual penetration, however slight." The outrage and other feelings do not become eightfold worse because it takes "eight or nine" slight sexual penetrations during a continuous, ongoing assault before the assailant manages to achieve a full penetration. Forced penetrations which start within the victim's sexual organs can produce just as much outrage to the personal feelings of the victim as do those originating outside the body. (Indeed Jamie S. complained the thrusts occurring *after* the successful insertion "hurt, he was hurting me" at least as much as she did about the previous unsuccessful attempts.)

Nor is the assailant's conduct eight times worse than if he had succeeded with his first thrust—either through luck or by force or threatened violence. Accordingly, in my view there is no rational reason for imposing a separate consecutive sentence for each of the individual slight sexual penetrations that were part of this single crime of rape. Had the victim broken free and fled to another location and appellant then renewed his attack, I would see it as a new crime subject to a new consecutive sentence, consistent with *People v. Harrison.* But the sequence of sexual thrusts which take place during a single, continuous assault with the perpetrator and victim in the same position and at the same location remain indivisible parts of a single crime and punishable only once with a single sentence, not with individual consecutive sentences for each sexual thrust.

I further note section 667.6 punishes individual violations of section 220, which is the sexual assault statute, rather than individual violations of the rape statute itself. It stretches the meaning of assault to suggest each sexual thrust which happens to begin outside the woman's sexual organs during a single continuous coerced intercourse at the same location and while the parties are in the very same position constitutes a separate assault and therefore that each such thrust can serve as the predicate for a separate consecutive sentence.

By giving section 667.6 the sensible interpretation suggested in this dissent, I also avoid serious constitutional questions this sentence otherwise raises under the equal protection and cruel and unusual punishment sections of the United States and California Constitutions. (See, e.g., *In re Lynch* (1972) 8 Cal.3d 410 [105 Cal.Rptr. 217, 503 P.2d 921] [under California Constitution, sentences must be reasonably proportionate to seriousness of offenses and punishment imposed on comparable offenses and offenders]; *People* v. *Keogh* (1975) 46 Cal.App.3d 919 [120 Cal.Rptr. 817] [cruel and unusual punishment to aggregate consecutive sentences for series of forged checks to produce life-maximum sentence]; Annot., Length of Sentence as Violation of Constitutional Provisions Prohibiting Cruel and Unusual Punishment (1970) 33 A.L.R.3d 335; *In re Rodriguez* (1975) 14 Cal.3d 639 [122

Cal.Rptr. 552, 537 P.2d 384] [disproportionate sentence may violate equal protection clause].)

As discussed earlier in this dissent, the severe, compound sentence the trial court imposed in this case is based on criteria which bear no relationship either to appellant's relative culpability, dangerousness, or the harm he inflicted compared to other rapists. As a consequence, the sentence is highly suspect under *Lynch* and like cases interpreting the cruel and unusual punishment or equal protection clauses.

For all these reasons, I would modify the sentence to reduce appellant's term from one hundred seven years to fifty-one years by staying seven of the eight consecutive eight-year terms the trial court imposed for the rape of Jamie S.

Appellant's petition for review by the Supreme Court was denied January 5, 1995. Mosk, J., was of the opinion that the petition should be granted.