102 Cal.Rptr.2d 403 (2000)
85 Cal.App.4th 706
The PEOPLE, Plaintiff and Respondent,
v.
Phia LEE et al., Defendants and Appellants.
No. F028940.
Court of Appeal, Fifth District.
December 18, 2000.
As Modified on Denial of Rehearing January 17, 2001.
Review Granted March 28, 2001.
*407 A.M. Weisman, under appointment by the Court of Appeal, for Defendant and Appellant Phia Lee.
Stephen Greenberg, under appointment by the Court of Appeal, for Defendant and Appellant Johnson Xiong.
Bill Lockyer, Attorney General, George Williamson, Chief Assistant Attorney General, Robert R. Anderson, Assistant Deputy Attorney General, Harry Joseph Colombo and Timothy L. Rieger, Deputy Attorneys General, for Plaintiff and Respondent.
Certified for Partial Publication.[*]

OPINION
WISEMAN, J.

INTRODUCTION
In the published portion of this gangland murder and attempted murder case, we hold the jury was properly instructed on the doctrine of transferred intent to kill as to the murder charges. We also hold the court erred by failing to instruct the jury that to find the enhancement penalty provisions of Penal Code section 664 subdivision (a) applicable, it must find the defendants personally premeditated and deliberated the attempted murders. We find, however, that the error was harmless beyond a reasonable doubt.
In the unpublished portion of the opinion, we hold insufficient evidence supports one of the attempted murder convictions and reduce it to a violation of section 245 subdivision (a)(2), assault with a deadly weapon.

PROCEDURAL HISTORY
By consolidated second information, defendants Johnson Xiong and Phia Lee were charged with two counts of murder (counts 1 & 2; Pen.Code [1] § 187) and seven counts of attempted murder (counts 3-9; §§ 664/187). A special circumstance allegation of multiple murders accompanied the murder counts. (§ 190.2, subd. *408 (a)(3).) On the attempted murder counts, it was alleged defendants personally inflicted great bodily injury. (§ 12022.7) As to every count, both defendants were alleged to have personally used a firearm. (§ 12022.5, subd. (a).)
Defendants pled not guilty, denied the allegations, and the case was tried by a jury. The great bodily injury allegations were dismissed for lack of sufficient evidence establishing which defendant inflicted which injuries. Xiong was convicted as charged on all counts, and the firearm use allegations were found true. Lee was convicted on counts one through five, and the firearm allegations were found true on these counts. Lee was found not guilty on the attempted murders charged in counts six through nine. The special circumstances and premeditation allegations on the murder counts, i.e., that the murders were of the first degree, were found true.
Probation was denied to both defendants. Xiong was sentenced to prison for two consecutive 25-years-to-life terms (counts 1 & 2), seven consecutive life-with-possibility-of-parole terms (counts 3-9), and a consecutive term of 36 years for his firearm use. Lee was sentenced to prison for two consecutive 25-years-to life terms (counts 1 & 2), three consecutive life-with-possibility-of-parole terms (counts 3-5), and a consecutive term of 20 years for his firearm use.
Both defendants filed timely notices of appeal.

I. FACTUAL HISTORY

A. Burns Street attempted murders (counts 6-9)[**]

B. Valeria Street murders and attempted murders (counts 1-5)
Shoua "Amy" Her testified she was a former member of the Ladies of Destruction (LOD). This gang was made up of females that spent time with MOD members (Men or Menace of Destruction). She testified both defendants Xiong and Lee were members of MOD. Former LOD members Blia "Tina" Xiong and Pahoua "Patty" Yang confirmed defendants' MOD membership.
Amy Her explained the gangs have territories they claim as their property. The MOD blamed the murder of two of their members, Hamburger and Tarzan, on the USC (Unstoppable or Unseen Criminals). Thong "Troy" Vang was a member of USC. Troy lived in an apartment complex on Valeria Street, which was in territory claimed by USC. Her was pleased when she saw the police cars and crime scene tape at Troy's Valeria apartments because she knew something bad must have happened to Troy, and she disliked him intensely.
At approximately 10:00 p.m. on June 21, 1995, officers responded to 232 North Valeria to investigate a murder. The officers collected numerous nine-millimeter shell casings, and noted many bullet holes and strike marks throughout the apartment complex. There was also gang graffiti on the walls and in the carport of the complex. One of the victims reported that two Asian males walked up to the corner of the apartment complex and began shooting into the apartment quad area. Shoe prints were found on the walkway and in the alley behind the complex. The prints had diamond-shape designs, and measured nine inches in length.
Doua Vang, age 19 at trial, testified he went to spend the night at his cousin Troy's apartment at 232 North Valeria in Fresno about 4:00 or 5:00 p.m. on June 21, 1995. Troy, who Doua knew was a USC member, left for work around 5:00 p.m. Doua was not a gang member, but spent time with Troy and occasionally with other USC members. Doua stayed at the apartment and waited for Troy to return. Doua stood in front of the complex at dusk, and saw a slow moving car approaching north to south on Valeria with Asian males in it, possibly Hmong. The car was dark-colored with two doors and looked like a Toyota. The front passenger looked like a *409 MOD member Doua knew as "Joey," a former middle-school classmate. Doua was afraid of people who did not like Troy, so he went inside Troy's apartment.
A short time later Doua sat outside on the apartment staircase about three-quarters of the way up to watch some boys play basketball in the courtyard. As he watched the game, Doua heard three or four shots fired. Doua saw the ball players being hit by the bullets and falling, and also heard them screaming. Doua looked at the shooters, who were both in the apartment courtyard, and he stood up. After standing there for two or three seconds, the shooters noticed Doua, i.e., their eyes met. Doua became scared and turned to run into Troy's apartment. As he ran up the stairs, Doua could hear the bullets whizzing by him. Doua thought that while he ran toward the door, Sandy Vang, who was standing by the door, was shot. As Doua entered the open door, Sandy was on the floor of the apartment just inside the doorway. After the initial barrage of three or four shots, Doua heard about seven or eight more shots fired as he ran into the apartment. While inside, he heard two more shots. Doua was shot in the leg as he ran up the stairs. After the shooting stopped, Doua went back outside. As he opened the door, he heard one of the shooters yell, "`MOD, fool.'" Doua saw both individuals standing in the same spot, but they had turned and began to run away.
Doua described the courtyard in front of the apartments as small, and very well lit. Officer Chandler estimated the courtyard, which was nothing more than a concrete slab, to be 30 feet wide and 18 feet deep. It was in the center of a U-shaped apartment complex of six apartments, three upstairs and three downstairs. Two parallel staircases on either side of the courtyard went from the open end of the U to the closed end, which had a landing in front of Troy's apartment, the upstairs, closed-end of the U. As Doua stood just above the shooters, he recognized defendant Xiong as the shooter standing closest to him. Doua had seen Xiong two or three times before at McLane High School, and knew Xiong was a MOD member who had dated his cousin, Amy Vang. Xiong had his hair cut short, with the hair in front longer and hanging forward like bangs. The other shooter was taller, had short hair no longer than half an inch long, and appeared to be shaved all around his head. This shooter was defendant Lee. Lee looked like someone Doua knew as "Trouble." However, he had never seen Lee before. By the time of trial, Doua was no longer sure whether Lee had a gun during the shooting.
Doua held back information from police regarding the identity of the shooters for approximately two weeks because he was afraid of retaliation by the MOD. Doua had been identified in news stories as an eyewitness, which included photo images of him. This increased his fear of retaliation. After revealing the identity of the shooters to his parents, his father and uncle convinced Doua to tell police.
Troy Vang was a founding member of the USC along with "Penguin." He had lived in the apartment building where the shooting occurred for seven or eight years. Graffiti identified the apartment complex as USC territory. Troy identified Xiong, Lee, Junior, "Topper" and Vee as members of MOD. He also knew Junior drove a two-door, faded red, Toyota Celica or Supra. Doua at first would not identify the shooters. About a week after the shooting, Doua identified Xiong as one of the shooters, but did not know the name of the other one. After conversations with Doua, Troy suspected the other shooter was Junior or Topper. He also suspected his ex-wife, Blia "Tina" Xiong, of being involved. Penguin was in prison for the murder of a MOD member.
Michelle Vang, Troy's sister, testified Penguin used to be her boyfriend. Troy was at work and she was sitting inside her apartment watching television when she heard the sound of firecrackers outside. *410 The apartment door was slightly open and Michelle saw her seven-year-old sister, Sandy, push the door open and fall into the apartment. As Michelle stood to help Sandy, Doua ran inside and told her to call 911 because there had been a drive-by shooting. Michelle's mother assisted Sandy, who had been shot. Michelle's five-year-old sister, Linda, was shot in the knee area. Just before the shooting, Linda had been standing by the heater near her mother. According to Doua, when he ran into the apartment Michelle was coming toward the door and Linda was on the living room couch.
Quang Minh Ha testified he visited a friend at the apartment complex and played basketball about 8:00 or 9:00 p.m. Eventually, only he and two others were playing. When one of the players went to the left corner of the courtyard to retrieve the ball, Ha heard the sound of several firecrackers. He turned around and saw two "guys," one taller and heavier than the other, by the stairs. They stood side by side near the east stairway, with the taller one closer to the stairs. The smaller person, who Ha was 50 percent positive was defendant Xiong, held a gun in his right hand. The other had a round face and very short hair. Ha was shot in the neck and shoulder. One of the other players dropped to the ground and died, and the player that retrieved the ball disappeared into an apartment.
Joua Toua Xiong testified he lived in apartment 201 at the time of the shooting. His son, Blong Xiong, then 14 years old, was shot and killed while playing basketball in the quad. Joua was in his apartment about 9:20 p.m., when he heard three shots. About three seconds later, he heard many shots.
During an autopsy of Sandy Vang's body forensic pathologist Venu Gopal found three gunshot wounds. One was to her right arm, another to her right thigh, and a fatal wound to the back of her head. Dr. Gopal's examination of Blong Xiong's body revealed a single gunshot wound to the back. The bullet traveled up the spinal canal and perforated the medulla oblongata, or spinal bulb, and likely caused instant death.
Rosa Pacheco lived in the apartment building just north of Troy's apartment building. As she sat by a large window facing Troy's apartment complex, she heard approximately 12 gunshots. She looked out her window and saw one teenage male begin to run away toward the alley, wearing a white T-shirt and black pants. Another teenage male stood near the east stairway with a gun pointed at the middle upstairs apartment. After the initial barrage, this teenager fired additional shots before running toward the alley. He was also wearing a white T-shirt and black pants. Pacheco heard them shout something in a language she did not understand, which led her to believe they were Asian.
Shortly before the shooting, Anthony Valenzuela was in his back yard near the alley behind the Valeria apartment complex. He saw two men near his van. Fearing they would steal his tools, he went inside for a gun and bulletproof vest. When he came out, the men were gone. While checking to see if anything was missing, Valenzuela heard three or four gunshots from the direction of the apartments. Then, after a delay of two or three seconds, he heard 10 or 15 more shots from the same area. Valenzuela took a couple steps toward the alley and saw two men running down the alley. They were about 10 to 12 feet away from Valenzuela when they ran past him. One of them turned and looked at Valenzuela, hesitated, and then kept running to Illinois Avenue where they entered a car and drove eastbound. Both had short hair and wore long white shirts. One was taller and had a bigger build. The other was smaller and thinner. It was the smaller man that looked at him. When he did so, Valenzuela jumped behind a fence. The taller man was running in front of the shorter one. The vehicle looked like an older Toyota *411 Supra or Celica hatchback, and was dark red, brown or maroon.
A year after the incident, Valenzuela selected defendants' photos from a photo lineup. Valenzuela identified Xiong as the short thin one that looked at him. He was not sure of his selection of Lee's photograph, but thought he might have been the taller suspect. At trial, Valenzuela was 80 to 90 percent sure Xiong was the person he observed. However, Valenzuela had seen Xiong's picture on television prior to selecting his photo. He denied having seen Lee's photo before the photo lineup, but did see it sometime before trial along with Xiong's photo. Valenzuela underwent rigorous cross-examination pertaining to possible bias as a witness.
In the summer of 1995, members of the MOD, LOD, and Hmong Pride gangs saw-Lee in Portland, Oregon. Chia "Danny" Cha, a former member of the Hmong Pride gang, testified that in the summer of 1995, Lee told Cha he was in Portland because he had been involved with another person in a Fresno drive-by shooting in which he "recently shot some kids." Lee stated the target of the shooting was the USC, which was the enemy of MOD. Lee said he shot his gun, which he had obtained from fellow gang members, at USC members five or six times but hit some innocent children instead. Lee stated a stolen vehicle was used for the drive-by shooting. Lee also stated the other person involved in the shooting went to Rhode Island afterward. At the time of his statements to police in 1996, Cha was no longer a gang member, and was willing to cooperate with law enforcement.
Lee was arrested in Portland, Oregon, on July 27, 1995. Xiong turned himself in to authorities on July 26, 1995, after the Fresno Bee ran an article with photographs of Xiong and Lee, stating they were wanted in connection with the Valeria Street shooting.
Sergeant Len Gleim testified as an expert on Asian gangs and as an investigator in the case. He found material in Xiong's bedroom that identified him as a member of MOD. He stated both defendants were members of MOD, and Troy Vang was a USC member. Gleim also testified about the rivalry between the two gangs, including the murder of MOD members by USC members. In addition, he testified that retaliation in kind is an integral function of Asian gangs.
The parties stipulated that on April 28, 1995, Xiong and Lee were together in Fresno.

C. Defense Case[***]

II. DISCUSSION

A.-C.[***]

D. The court properly instructed the jury on the doctrine of transferred intent.
Defendants contend the court erred by instructing the jury on the principles of the transferred intent doctrine regarding the Valeria Street murders of Sandy Vang and Blong Xiong. In addition, they complain the prosecutor's argument on the doctrine of transferred intent was erroneous and likely misled the jury to their detriment. We reject these contentions.

1. The law
The California Supreme Court explained and applied the classic formulation of the doctrine of transferred intent in People v. Scott (1996) 14 Cal.4th 544, 546, 59 Cal. Rptr.2d 178, 927 P.2d 288, summarizing as follows:
"Under the classic formulation of California's common law doctrine of transferred intent, a defendant who shoots with the intent to kill a certain person and hits a bystander instead is subject to the same criminal liability that would *412 have been imposed had `"the fatal blow reached the person for whom intended."' (People v. Suesser (1904) 142 Cal. 354, 366 [75 P. 1093] (hereafter Suesser).) In such a factual setting, the defendant is deemed as culpable as if he had accomplished what he set out to do.
"Here, it was established at trial that defendants fired an automatic weapon into a public park in an attempt to kill a certain individual, and fatally shot a bystander instead. The case presents the type of factual setting in which courts have uniformly approved reliance on the transferred intent doctrine as the basis of determining a defendant's criminal liability for the death of an unintended victim. Consistent with a line of decisions beginning with Suesser nearly a century ago, we conclude that the jury in this case was properly instructed on a transferred intent theory of liability for first degree murder.
"Moreover, defendants' exposure to a murder conviction based on a transferred intent theory of liability was proper regardless of the fact they were also charged with attempted murder of the intended victim. Contrary to what its name implies, the transferred intent doctrine does not refer to any actual intent that is `used up' once it has been employed to convict a defendant of a specific intent crime against an intended victim. Rather, the doctrine of transferred intent connotes a policy. As applied here, the transferred intent doctrine is but another way of saying that a defendant who shoots with an intent to kill but misses and hits a bystander instead should be punished for a crime of the same seriousness as the one he tried to commit against his intended victim.
"In this case, defendants shot at an intended victim, missed him, and killed another person instead. In doing so, defendants committed crimes against two persons. Defendants' criminal liability for causing the death of the unintended victim may be determined on a theory of transferred intent in accordance with the classic formulation of the doctrine under California common law. Their criminal liability for shooting at the intended victim with an intent to kill is that which the law assigns." (People v. Scott, supra, 14 Cal.4th 544, 546, 59 Cal.Rptr.2d 178, 927 P.2d 288.)
Here, the jury was instructed pursuant to CALJIC No. 8.65 as follows:
"When one attempts to kill a certain person, but by mistake or inadvertence kills a different person, the crime, if any, so committed is the same as though the person originally intended to be killed, had been killed."
Defendants do not attack the correctness of this instruction, but argue it should not have been given because there was no evidence to support a valid transferred intent theory. Consequently, defendants argue inclusion of this jury instruction was reversible error.

2. Failure to objectmiscarriage of justice standard of prejudice
Defendants acknowledge they failed to object to the transferred intent jury instruction. They nonetheless argue the court's alleged error is cognizable on appeal under section 1259.
"Normally, a defendant is held to waive the right to appeal alleged errors by failing to make an appropriate objection in the trial court; however, an appellate court may review any instruction given even though no objection was made in the lower court if the substantial rights of the defendant are affected. (Pen. Code, §§ 1259, 1469.) The cases equate `substantial rights' with reversible error, i.e., did the error result in a miscarriage of justice? (Cal. Const., art. VI, § 13; People v. Watson (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)" (People v. Arredondo (1975) 52 Cal.App.3d 973, 978, 125 Cal.Rptr. 419; accord People v. Kainzrants (1996) 45 Cal.App.4th 1068, 1075, 53 Cal.Rptr.2d 207; People v. Andersen *413 (1994) 26 Cal.App.4th 1241, 1249, 32 Cal.Rptr.2d 442; People v. Martinez (1984) 157 Cal.App.3d 660, 670, 203 Cal. Rptr. 833.)
Before we can determine whether the giving of the transferred intent instruction was error resulting in a miscarriage of justice, we must first determine whether defendants' assignment of error is correct.

3. The evidence supports the giving of the transferred intent instruction.
Defendants' underlying contention of error is that no evidence supported the giving of the transferred intent instruction. We disagree. In its absence, the jury could have erroneously found the killings were accidental or inadvertent even in the face of overwhelming evidence which supported findings that defendants fired their weapons with the specific intent to kill after premeditating, planning and deliberating the killings. Specifically, Chia "Danny" Cha, a former member of the Hmong Pride gang, testified that in the summer of 1995, defendant Lee told Cha he was in Portland because he had been involved with another person in a Fresno drive-by shooting in which he "recently shot some kids." Lee stated the target of the shooting was the USC, which was the enemy of MOD. Lee said he shot his gun five or six times at USC members but hit some innocent children instead.
However, even absent Lee's admissions, there was substantial evidence that defendants, MOD members, had planned a gangland hit against their rival, the USC. Troy Vang was a known member of the USC, and the Valeria apartments in which he lived were marked by graffiti as USC territory. A USC member had recently killed a member of the MOD whose nickname was Hamburger. While the evidence overwhelmingly supported an intent to kill everyone outside the Valeria apartments at the time defendants aimed their guns and shot at them, the evidence also supported a theory, although a weak one, that defendants' sole targets for murder were USC members in general, and Troy Vang in particular. There was no evidence that either seven-year-old Sandy Vang or thirteen-year-old Blong Xiong were USC members. Thus, to the extent the jury could find that USC members were the murder targets, the jury could also have found Sandy and Blong were murdered as innocent bystanders through inadvertence caused by bad aim (Sandy) or mistaken identity (Blong). Therefore, the instruction was necessary to avert a potential miscarriage of justice and to serve the policy behind the doctrine of transferred intent. Otherwise, defendants might have gotten away with murder, despite overwhelming evidence of premeditation and deliberation to commit murder, intent to kill, and the actual cold-blooded gunning down of two children whose crime was to play outside their apartments.
Further, assuming for the sake of argument that there was insufficient evidence to warrant the transferred intent instruction, this error could not have affected the substantial rights of defendants or resulted in a miscarriage of justice. The manner in which defendants killed their victims overwhelmingly supports the first-degree murder convictions. It is not reasonably probable that absent the instruction, defendants would have received a more favorable result. (People v. Watson, supra, 46 Cal.2d at p. 836, 299 P.2d 243; People v. Arredondo, supra, 52 Cal. App.3d at p. 978, 125 Cal.Rptr. 419.)

4. The prosecutor's argument
Defendants also contend the prosecutor's argument to the jury was erroneous and misled the jury to their detriment. However, defendants made no objections or requests for admonition to the allegedly offending argument. Further, the record does not support their contention or a conclusion that they were prejudiced.
The prosecutor began opening argument by discussing her theory of first-degree *414 attempted murder of the four boys on Burns Street. She argued intent to kill was clear, thereby establishing malice, and the evidence also showed planning, premeditation and deliberation. Specifically, the prosecutor emphasized the three shooters approached surreptitiously under the guise of trying to buy marijuana. They did so to put the victims at ease and allow the shooters to come into close range. They waited until dusk in an attempt to conceal their identities. In addition, the big guy walked in front to conceal the identities of the other two shooters, especially defendant Xiong, who lived down the street and was known to the victims. All the shooters earned concealed loaded handguns. All fired their guns, as evidenced by the three different caliber casings left at the scene, and then fled. Finally, the critical areas of the body where the victims were hit evidenced the intent to kill. With respect to motive, the prosecutor argued that defendants were members of the MOD, and they hated the USC. Sa Hang looked like his cousin Xay Hang, who was believed to be a member of the USC. In addition, the prosecutor referred to Cheng's testimony that Johnson Xiong hated Xay Hang because Xay had called Xiong "a faggot," and that "retaliation is what makes a gang tick."
Later, the prosecutor turned her attention to the Valeria Street murder and attempted murder charges. In arguing premeditation and deliberation as to the murder victims, the prosecutor noted there was no provocation. "I mean, obviously Blong Xiong and Sandy Vang were no threat to Phia Lee or Johnson Xiong. They weren't armed. They weren't trying to kill either Phia Lee or Johnson Xiong."
The prosecutor argued defendants intended to kill by again shooting their victims at close range where the victims were confined. "You heard Mr. Quang Minh Ha tried to get out of the area, tried to get in a door, stuck against a wall waiting until this shooting stopped . . . ." The prosecutor argued there was planning involved, thereby showing premeditation. The MOD first conducted surveillance of the area earlier in the evening by driving by on Valeria Street, and scaring Doua into going inside Troy's apartment. After waiting for darkness to fall to conceal their identities, defendants carried out their plan.
"[T]hey parked [their vehicle] out of sight of anybody within the apartment complex at 232 North Valeria. They put it on the alley side. They were on Illinois, opposite side of the street with the car pointing towards Fresno Street for a quick getaway, and they approach from the alley first, you know, gathering their thoughts, getting it together as they leaned against Anthony Valenzuela's van.
"Then they entered the courtyard. Didn't say anything then, but they open up fire first on the kids who were playing basketball on the ground floor, killing Blong Xiong, hitting Quan Minh Ha in the throat, then when Doua Vang stands, they direct their attention to him and fire hitting Linda Vang and Sandy Vang. Two guns, both loaded in advance.
"And likewise, I mean, I'm sure you were quite surprised when you went out to the Valeria scene to actually see how small that quad area was enclosed by the cyclone fence and the walls of the apartments. There was no way for any of those victims to get away, to get cover."
Also, the prosecutor argued defendants fired two separate guns at least eight times at close range. After summarizing the evidence showing premeditation, deliberation and intent to kill, the prosecutor turned to defendants' motive for first-degree murderTroy and the feud between MOD and USC. The prosecutor noted MOD hated Troy and that he and other USC members had been bragging about killing MOD members Hamburger and Tarzan.
*415 After setting forth her theory for first degree murder and attempted murder convictions and motive, the prosecutor briefly mentioned the doctrine of transferred intent as follows:
". . . Those two defendants intended to kill Troy Vang, a rival of theirs. The fact that Troy was not actually killed or shot does not relieve them of the responsibility of first-degree murder.
"In the law there's a theory called transferred intent, and that is when one intends to kill a certain person but by mistake or inadvertence kills a different person, the crime is the same as though the person originally intended to be killed had been killed. So when they intended to kill Troy Vang but didn't, he wasn't there, their intent transfers from Troy to the other victims there who were actually present and shot on Valeria on that particular night. Sandy and Blong were killed, the two children, not Troy. But again because of transferred intent these two are as liable as if they had killed Troy, been successful with their original intent as to a target."
It is these statements that defendants contend were erroneous. Specifically, defendants argue:
"Under the prosecutor's theory, however, the shooters' conduct need not have amounted to an attempt to murder Troy Vang; a free-floating `intent to kill' the absent Troy was sufficient to trigger transfer of that intent to the five shooting victims. But since `intent to kill' is not a criminal offense, `[t]he purpose of the transferred intent ruleto ensure that prosecution and punishment accord with culpabilitywould not be served' here. (People v. Czahara, supra, 203 Cal.App.3d at 1474, 250 Cal.Rptr. 836.)"
It is true that because Troy was not present, the shooters were unsuccessful in killing Troy or, technically speaking, attempting to kill Troy by shooting at him. However, the transferred intent instruction did not mention Troy. And the instruction was proper based on, among other evidence, Phia Lee's statement that he intended to kill USC members but accidentally shot innocent children instead. (See People v. Williams (1997) 16 Cal.4th 635, 683, 66 Cal.Rptr.2d 573, 941 P.2d 752 ["that specific intent [to kill] did not have to apply to a specific person or persons was a correct statement of law"].) Troy was a USC member, and lived at the Valeria Street apartments. The evidence was reasonably susceptible of the inference that defendants thought Troy was among the young men they attempted to kill outside the Valeria apartment, only to learn later that he was not. Considered in this light, the prosecutor's argument was not erroneous. Instead, it raised a theory the jury could rely on if it had doubts about whether any plan defendants had to kill Troy would relieve them of responsibility for first-degree murder convictions simply because Troy was not present.
Defendants argue the prosecutor completely disregarded the basic premise for application of the transferred intent doctrine that their conduct must amount to an "`attempt to kill' Troy Vang." While the classic application of the doctrine of transferred intent is one where the killer attempts to kill by shooting at a particular individual and kills a bystander (see People v. Scott, supra, 14 Cal.4th at p. 546, 59 Cal.Rptr.2d 178, 927 P.2d 288), that is not the only application. (See People v. Williams, supra, 16 Cal.4th at p. 684, 66 Cal.Rptr.2d 573, 941 P.2d 752 ["when a defendant intends to kill one particular person, but kills someone else mistakenly believing the person killed to be the intended victim, defendant has the requisite intent for first degree murder"].) Defendants are attempting to convert the doctrine of transferred intent to a "doctrine of transferred attempt." However, as the Scott court made clear, "the doctrine of transferred intent connotes a policy." (People v. Scott, supra, 14 Cal.4th at p. 546, 59 Cal.Rptr.2d 178, 927 P.2d 288.) This policy was adopted by California in the case of People v. Suesser supra, 142 *416 Cal. at page 366, 75 P. 1093. (Scott, supra, at p. 549, 59 Cal.Rptr.2d 178, 927 P.2d 288.) The facts of Suesser make it clear that the narrow interpretation defendants urge here, i.e., a completed attempt to kill the intended victim, must be rejected.
In Suesser, the defendant had threatened to kill individuals named Delaney and Allen, but instead killed victim Farley, a sheriff. The prosecution's theory was that the defendant had decided to kill Delaney and Allen, and had left his home armed for that purpose. When Farley attempted to stop defendant, the defendant deliberately killed Farley. (People v. Suesser, supra, 142 Cal. at p. 362, 75 P. 1093.) There was also testimony tending to show the defendant claimed that he mistook Farley for Allen, whom he intended to kill, and fired the fatal shot believing he was firing at Allen. This evidence called for a transferred intent instruction. (Id. at pp. 365-366, 75 P. 1093.) The court held the jury was properly instructed on the doctrine of transferred intent by adopting the overwhelming weight of authority.
". . . It is said in the American and English Encyclopedia of Law (2d ed., vol. 21, p. 165): `There is some conflict of authority as to whether or not the homicide can constitute murder in the first degree, where the intent was to kill a third person, but by some accident or inadvertence the deceased was killed, instead of the person intended. The better doctrine is that a homicide so committed is as much murder in the first degree as it would have been had the fatal blow reached the person for whom intended,'citing the following cases, which uphold the rule stated to be the `better doctrine,' viz.: State v. Raymond, 11 Nev. 98; State v. Murray, 11 Or. 413, 415 [5 P. 55]; State v. Payton, 90 Mo. 220 [2 S.W. 394]; Commonwealth v. Eisenhower, 181 Pa. St. 470; State v. McGonigle, 14 Wash. 594 [45 P. 20]. In McClain on Criminal Law (vol. 1, sec. 323) it is said: `In determining the criminality of the act of killing it will be immaterial whether the intent was to kill the person killed or whether the death of such person was the accidental or otherwise unintended result of the intent to kill some one elsethe criminality of the act will be deemed the same.'
"In Wharton on Criminal Law (vol. 1, sec. 120) it is said: `A looking for B sees C whom he mistakes for B and whom he kills. This is murder because the intent to kill, however mistaken his reasoning, was really pointed at C (See, also, 1 Wharton on Criminal Law, sec. 318; also Kerr on Law of Homicide, sec. 99; Bishop's New Criminal Law, sec. 328.)" (People v. Suesser, supra, 142 Cal. at pp. 366-367, 75 P. 1093, fn. omitted.)
As can be seen, defendants' contention is meritless. As shown by Suesser, even though no actual attempt to kill Allen was ever effected, Suesser's intent to kill Allen could be transferred to Farley.[4] Similarly here, the fact that no actual attempt to kill Troy was effected (because he was at work instead of at home playing basketball) does not make the policy behind the transferred intent doctrine inapplicable. The intent to kill Troy could be transferred to the actual victims at the time defendants fired their handguns with the intent to kill. Likewise, defendants' premeditation and planning did not go for naught even though they were unsuccessful in killing MOD members. That planning and premeditation could serve as the basis for first-degree murder convictions on their actual victims, Sandy and Blong.
In any event, even if the prosecutor misstated the transferred intent doctrine, the jury was correctly instructed. It is not reasonably probable, in light of the overwhelming evidence of premeditation, deliberation, planning and intent to kill, that defendants would have received a more *417 favorable result in the absence of the brief argument presented by the prosecutor. (People v. Watson, supra, 46 Cal.2d at p. 836, 299 P.2d 243.) As noted earlier, this theory was not the main one argued to the jury, and merely addressed the possibility the jury might accept as true the statement attributed to Phia Lee that the killings were accidental or inadvertent.
Contrary to defendants' position, the prosecutor did not expressly or impliedly mention the transferred intent doctrine in her closing argument. As she had done at length in her opening argument, the prosecutor explained that the evidence established first-degree murder based on planning, premeditation, etc. The prosecutor first articulated her theory: "Now with respect[ ] to premeditation in the Valeria shooting, this was a very planned-out, thought-out murder of both Sandy Vang and Blong Xiong." The prosecutor then supported this theory with her rendition of the facts:
"You know, we have a situation where there was a car that surveilled the area just before, ten minutes before the shooting, that's what Doua Vang told us when he testified. He recognized some of the occupants of the car as being MOD members, and that's when he returned to the internal parts of the apartment complex.
"We saw where the defendants placed their car. It was at the alleyway, out of sight, but close by so they could get to it easily, pointed towards Fresno Street so they won't have to make a U-turn or go further into any other residential areas. And how they came up the alley to approach the apartment complex? They didn't enter at Valeria from the gate that we all did, it was from the alley that they entered to conceal their identifications.
"Both of them were armed, trying to conceal their identity. Like the Burns shooting, they chose dusk hoping that they could see, but maybe the potential victims could not see or recognize their identity. This wasn't just random shooting, just spraying a building with their shots. We know that they fired nine shots based on the bullets that were found on the scene and the one that was removed from Blong Xiong, the casings. There were three shots to Sandy Vang, all through-and-throughs, one shot to Blong Xiong, one to Linda, one to Doua and two to Quang Minh Ha, one in the shoulder, one in the throat. Seven of nine hit. That's pretty darn good aiming. It wasn't just randomly firing at the building."
The evidence supports these facts. This was an open and shut case of gangland-style first-degree murder. The only real issue was whether defendants were the murderers. The transferred intent doctrine was thrown out merely as a safety net so the shooters would not get away with murder on the technicality that they intended to kill someone other than Sandy or Blong.

5. The attempted murder convictions
Finally, the record, when read in context, also does not support defendants' contention that the prosecutor argued the transferred intent doctrine applied to the charged attempted murders. We need not repeat the prosecutor's argument on transferred intent already quoted in its entirety above. Read in context, it is clear the prosecutor referenced only "first-degree murder," and that it applied only to "Sandy and Blong [who] were killed, the two children, not Troy."
On the other hand, when read in isolation, the actual words spoken by the prosecutor might be understood as telling the jury that the transferred intent doctrine applied to the Valeria attempted murders. "So when they intended to kill Troy Vang but didn't, he wasn't there, their intent transfers from Troy to the other victims there who were actually present and shot on Valeria on that particular *418 night." In any event, the issue was waived and any misconduct was harmless.
"Improper remarks by a prosecutor can `"so infect[ ] the trial with unfairness as to make the resulting conviction a denial of due process."' [Citations.]" (People v. Frye (1998) 18 Cal.4th 894, 969, 77 Cal.Rptr.2d 25, 959 P.2d 183.) "But conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves `"the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury."' [Citations.]" (People v. Espinoza (1992) 3 Cal.4th 806, 820, 12 Cal.Rptr.2d 682, 838 P.2d 204; People v. Price (1991) 1 Cal.4th 324, 447, 3 Cal.Rptr.2d 106, 821 P.2d 610.) The ultimate question to be answered is whether it is reasonably probable that a result more favorable to defendant would have occurred had the prosecutor refrained from such misconduct. (E.g., People v. Marshall (1996) 13 Cal.4th 799, 831, 55 Cal.Rptr.2d 347, 919 P.2d 1280.)
"`As a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion and on the same groundthe defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety. [Citation.]' [Citation.]" (People v. Hill (1998) 17 Cal.4th 800, 820, 72 Cal.Rptr.2d 656, 952 P.2d 673.) One exception to this rule excuses a defendant from "the necessity of either a timely objection and/or a request for admonition if either would be futile. [Citations.]" (Ibid.) In addition, "the absence of a request for a curative admonition does not forfeit the issue for appeal if `the court immediately overrules an objection to alleged prosecutorial misconduct [and as a consequence] the defendant has no opportunity to make such a request.' [Citations.]" (People v. Hill, supra, 17 Cal.4th at pp. 820-821, 72 Cal.Rptr.2d 656, 952 P.2d 673.)
Finally, to prevail on a claim of prosecutorial misconduct based on remarks to the jury, the defendant must show a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner. (People v. Berryman (1993) 6 Cal.4th 1048, 1072, 25 Cal.Rptr.2d 867, 864 P.2d 40, disapproved on other grounds in People v. Hill, supra, 17 Cal.4th at p. 823, 72 Cal.Rptr.2d 656, 952 P.2d 673.) In conducting this inquiry, "we do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements. (People v. Howard (1992) 1 Cal.4th 1132, 1192, 5 Cal.Rptr.2d 268, 824 P.2d 1315.)
Here, defendants failed to object to the prosecutor's comments or request an admonition, which could easily have cured any potential harm. Therefore, the alleged error is waived. Secondly, defendants fail to show there is a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous way. In this respect, as noted above, when read in context, the prosecutor's statement was not misleading. Nothing in the record indicates we should infer the jury was misled. To the contrary, the lack of objection by either defense counsel indicates the argument was not misleading. Further, the jury instruction made it clear the doctrine of transferred intent applied only "[w]hen one attempts to kill a certain person, but by mistake or inadvertence kills a different person." (CALJIC No. 8.65, emphasis added; People of Territory of Guam v. Quichocho (9th Cir.1992) 973 F.2d 723, 729 [by its own terms, CALJIC No. 8.65 was limited to the murder count].) Finally, even if error were assumed, as discussed above, it would be harmless. In light of the manner in which the attempted murders were carried out, it is not reasonably probable defendants would have received a more favorable result in the absence of the allegedly offending statement.

*419 E. The court erred in failing to instruct that defendants must have personally premeditated and deliberated attempted murder in the context of aider and abettor liability.

Defendants argue the court erred when it failed to instruct the jury that they could not be convicted of premeditated attempted murder as an aider and abettor unless it found each defendant personally premeditated and deliberated. That argument was made and rejected in People v. Laster (1997) 52 Cal.App.4th 1450, 61 Cal. Rptr.2d 680, upon which the People rely. There, the defendants were convicted of four counts of deliberate and premeditated attempted murder arising out of a drive-by shooting. Based on the defense contention that the shooting was the unplanned and unforeseen act of another passenger in the same vehicle, one of the prosecution's theories was that the defendants were still liable as aiders and abettors for the premeditation and deliberation of the perpetrator. (Id. at p. 1455, 61 Cal.Rptr.2d 680.) On appeal, defendants argued the jury instructions regarding aiding and abetting were insufficient because the section 664, subdivision (a)[5] penalty required a showing that the aider and abettor premeditated the murder. (52 Cal.App.4th at p. 1469, 61 Cal.Rptr.2d 680.) The court, applying the plain meaning of the language to determine the legislative intent, disagreed:
"Penal Code section 664, subdivision (a) brings within its scope `[e]very person who attempts to commit any crime. . . .' This phrase necessarily encompasses those who aid and abet an attempt; otherwise, an aider and abettor could not be punished for attempt at all. It then imposes three different measures of punishment on `the person guilty of that attempt,' depending on the nature of `the crime attempted':
"1. If `the crime attempted' is willful, deliberate, premeditated murder, `the person guilty of that attempt' is subject to life imprisonment.
"2. If `the crime attempted' is any other one in which the maximum sentence is life imprisonment or death, `the person guilty of the attempt' is subject to imprisonment for a term of five, seven, or nine years.
"3. If `the offense so attempted' is any other one punishable by imprisonment, `the person guilty of that attempt' is subject to imprisonment for half the term applicable to the completed offense.
"Again, these terms necessarily encompass an aider and abettor. Whenever an aider and abettor is convicted of attempt, there is `a crime attempted,' even though he or she did not personally attempt the crime. Moreover, under the derivative liability principles of Penal Code section 31, the aider and abettor is a `person guilty of that attempt'
"Any other construction would be absurd; if the `willful, deliberate, and pre-meditated *420 murder' clause could be construed as excluding aiders and abettors, the other clauses of Penal Code section 664, subdivision (a) would have to be construed identically, meaning, again, that an aider and abettor could not be punished for attempt at all.
"We conclude that an aider and abettor can be subject to life imprisonment for willful, deliberate, and premeditated murder even if he or she did not personally deliberate or premeditate." [People v. Laster, supra, 52 Cal.App.4th at pp. 1472-1473, 61 Cal.Rptr.2d 680.)
We respectfully disagree with the court's reasoning in Laster.

1. Analysis
In People v. Bright (1996) 12 Cal.4th 652, 49 Cal.Rptr.2d 732, 909 P.2d 1354, the court determined the legislative intent of the 1986 amendment of section 664, and that interpretation is in conflict with Laster's construction. Reviewing the history of section 664, Bright held: "We conclude that the provision in section 664, subdivision (a), imposing a greater punishment for an attempt to commit a murder that is `willful, deliberate, and premeditated' does not create a greater degree of attempted murder but, rather, constitutes a penalty provision that prescribes an increase in punishment (a greater base term) for the offense of attempted murder." (Id. at pp. 656-657, 49 Cal.Rptr.2d 732, 909 P.2d 1354.) In the face of two separate, strong and lengthy dissents by Justices Mosk and Kennard tracing the legislative history of section 664, the majority explained its conclusion:
"In ascertaining legislative intent, we turn first to the statutory language employed. [Citation.] Nothing in the wording of the amendment reflects a legislative intent to create a greater degree of the offense of attempted murder, unlike legislative provisions that specifically and expressly establish higher degrees of crimes where aggravating circumstances are present. [Citation.] The language of the newly added provisionthat `[t]he additional term provided in this section for attempted willful, deliberate, and premeditated murder shall not be imposed unless the fact that the attempted murder was willful, deliberate, and premeditated is charged in the accusatory pleading and admitted or found to be true by the trier of fact' (§ 664, subd. (a), italics added)is the language typically employed in describing sentence enhancements, as opposed to defining a crime or prescribing the term of imprisonment for the crime itself. (See 3 Witkin & Epstein, Cal.Criminal Law (2d ed. 1989) Punishment for Crimes, § 1473, p. 1749 [generally, enhancement provisions refer to imposition of an `additional term']; see, e.g., §§ 667.7, 667.72, 667.75, 12022, 12022.5, 12022.55; see also 3 Witkin & Epstein, Cal.Criminal Law, op. cit. supra, § 1473, p. 1750 [a statute may include both provisions specifying the punishment for a crime and provisions imposing enhancements].)
"Thus, the statutory language employed in prescribing an additional penalty for attempted murder where the jury finds true as charged the aggravating circumstance that the offense was willful, deliberate, and premeditated reflects a legislative intent to create a penalty provision specifying a greater term, rather than a substantive offense. Moreover, as we have seen, at the time of the 1986 amendment it was well established that the crime of attempted murder was not divided into degrees, and we may presume that, had the Legislature intended to alter this generally recognized rule, it would have done so explicitly. We are unaware of any California penal provision creating degrees of an offense by implication. For these reasons, we find no basis" (People v. Bright, supra, 12 Cal.4th at pp. 667-668, 49 Cal.Rptr.2d 732, 909 P.2d 1354.) for defendant's conclusion that, in amending the statute to prescribe a life sentence *421 for attempted murder that is willful, deliberate, and premeditated, the Legislature sought to carve out a separate, higher degree of the crime of attempted murder.
As can be seen, Laster's plain meaning construction of section 664 cannot be reconciled with the construction given that same language in Bright. Under Bright, there is only one possible violation for attempted murder since there are no degrees of attempted murder, and because the penalty provision for willful, premeditated, and deliberate attempted murder did not create a "substantive offense." (People v. Bright, supra, 12 Cal.4th at p. 668, 49 Cal.Rptr.2d 732, 909 P.2d 1354.) A crime of attempted willful, premeditated and deliberate murder does not exist. In light of Bright's statutory interpretation of section 664, we examine Laster's conclusion and reasoning to see if it withstands critical analysis.
Laster correctly holds that the phrase "[e]very person who attempts to commit any crime" encompasses those who aid and abet an attempt under section 31, which defines principals in the commission of crime. (People v. Laster, supra, 52 Cal.App.4th at pp. 1472-1473, 61 Cal. Rptr.2d 680.) Laster is also correct that section 664 then provides different measures of punishment depending on the crime attempted. (Id. at p. 1473, 61 Cal. Rptr.2d 680.) We believe Laster is incorrect, however, in holding that "[i]f `the crime attempted' is willful, deliberate, and premeditated murder, `the person guilty of that attempt' is subject to life imprisonment." (Ibid.) As made plain by our Supreme Court in Bright, the language of section 664 does not permit a construction that an attempt to commit a willful, premeditated and deliberate murder constitutes a substantive crime or a greater degree of a crime. Section 664 permits a conviction of attempted murder, and in subdivision (a) provides a penalty provision (a greater base term) when that crime is admitted to or proven to have been willful, premeditated and deliberate. (People v. Bright, supra, 12 Cal.4th at pp. 656-657, 668, 49 Cal.Rptr.2d 732, 909 P.2d 1354.)
Contrary to Laster's conclusion that the terms used in section 664 necessarily encompass an aider and abettor, the Legislature's intent in imposing derivative liability must be much clearer than the language used in section 664, subdivision (a). Before addressing this issue, we first turn to Laster's conclusion that "if the `willful, deliberate and premeditated murder' clause could be construed as excluding aiders and abettors, the other-clauses of Penal Code section 664, subdivision (a) would have to be construed identically, meaning . . . that an aider and abettor could not be punished for attempt at all." (People v. Laster, supra, 52 Cal. App.4th at p. 1473, 61 Cal.Rptr.2d 680.) This result, however, does not follow. As Laster recognized, the language in section 664 that brings aiders and abettors within its net is the introductory language, i.e., "[e]very person who attempts to commit any crime. . . ." (Id. at pp. 1472-1473, 61 Cal.Rptr.2d 680.) Subdivision (a) of section 664 does not define crimes but instead refers to the punishment applicable to the crime attempted where no other provision is made by law for the punishment of the attempt. (People v. Ross (1979) 92 Cal. App.3d 391, 403, 154 Cal.Rptr. 783 ["Typically, penal provisions imposing added punishment do not purport to define a criminal offense but simply relate to the penalty to be imposed under certain circumstances"].) Under Bright, an aider and abettor may be held liable for attempted murder under the traditional application of sections 664, 187 and 31 if he or she aided and abetted another in the commission of the attempted crime of murder. (See People v. Olguin, (1994) 31 Cal. App.4th 1355, 1380, 37 Cal.Rptr.2d 596 ["no specific intent is required for liability as an aider and abettor other than the intent to aid, encourage, facilitate or promote a criminal act"].) Whether an aider and abettor may be punished with a life *422 sentence under subdivision (a) of section 664 is a separate question. In our view, Laster erroneously lumped the two issues together, thereby tainting its statutory interpretation analysis.
To determine whether the Legislature intended to impose derivative liability where the actor who was aided and abetted attempted a willful, deliberate, and premeditated murder, we look to People v. Walker (1976) 18 Cal.3d 232, 133 Cal.Rptr. 520, 555 P.2d 306. (People v. Rener (1994) 24 Cal.App.4th 258, 267, 29 Cal.Rptr.2d 392 ["the Supreme Court's analysis in Walker . . . is the lodestar by which we must be guided"].) In Walker, the Supreme Court held that a defendant is not subject to a firearm use enhancement under former section 12022.5, unless he or she personally used the firearm.
"Generally, if a statute is intended to impose a derivative liability on some person other than the actor, there must be some legislative direction that it is to be applied to persons who do not themselves commit the proscribed act. Such a direction is found in section 31 which fixes responsibility on an aider and abettor for a crime personally committed by a confederate. But the statute which defines aiders and abettors as principals in the commission of a criminal offense does not also purport to impose additional derivative punishment grounded on an accomplice's personal conduct, as those statutes which provide for such increased punishment `"do not define a crime or offense but relate to the penalty to be imposed under certain circumstances."' [Citations.] Hence the rules which make an accused derivatively liable for a crime which he does not personally commit, do not at the same time impose a derivatively increased punishment by reason of the manner in which a confederate commits the crime. [¶] . . . [¶] Our conclusion, of course, is also compelled by the established policy `to construe a penal statute as favorably to the defendant as its language and the circumstances of its application reasonably permit; . . . the defendant is entitled to the benefit of every reasonable doubt as to the true interpretation of words or the construction of language used in a statute.' [Citation.]" (People v. Walker, supra, 18 Cal.3d at pp. 241-242, 133 Cal.Rptr. 520, 555 P.2d 306.)
In People v. Cole (1982) 31 Cal.3d 568, 576, 183 Cal.Rptr. 350, 645 P.2d 1182, the Supreme Court noted the legislative response buttressed its holding in Walker, and rejected the proposition that additional punishment liability "may be based on prohibited conduct performed by one other than the charged defendant." (Ibid.) Instead, "[t]he 1977 amendment to section 12022.5 endorsed the judicial interpretation enunciated by Walker, so that the statute now explicitly requires that the defendant personally use a firearm before the provision is applicable." (Ibid.) The court held that section 12022.7 could not apply to persons who merely aided and abetted, even where a person "directs another to inflict the physical injury . . . ." (Id. at p. 571, 183 Cal.Rptr. 350, 645 P.2d 1182.)
In People v. Piper (1986) 42 Cal.3d 471, 229 Cal.Rptr. 125, 722 P.2d 899, the Supreme Court again relied on Walker. It held the enhancement under sections 667/1192.7, subdivision (c)(8) for a prior conviction of a felony in which the defendant used a firearm applied only if the prior felony required personal firearm use. The court explained at page 477, 229 Cal. Rptr. 125, 722 P.2d 899:
"Since Walker, the Legislature has been quite explicit when it intends an enhancement provision to apply to a defendant even though he himself does not commit the proscribed act. For example, section 12022, subdivision (a) which provides a one-year enhancement for `[a]ny person who is armed with a firearm in the commission . . . of a felony'goes on specifically to provide that `[t]his additional term shall apply to any person who is a principal in the commission *423 or attempted commission of a felony if one or more of the principals is armed with a firearm, whether or not such person is personally armed with a firearm.'
"Subdivision (c)(8), of course, contains no similar language indicating that it was intended to apply even when the defendant himself did not personally use a firearm. Accordingly, the principle of interpretation applied in Walker supports the conclusion that the subdivision should be construed to apply only to defendants who personally use a firearm in the commission of a felony.
"Finally, even if the juxtaposition of the language of subdivision (c)(23) and subdivision (c)(8) creates some ambiguity as to the reach of subdivision (c)(8), under settled principles such ambiguity must properly be resolved in favor of the defendant. [Citation.]." (People v. Piper (1986) 42 Cal.3d 471, 477, 229 Cal.Rptr. 125, 722 P.2d 899, fn. omitted.)
"Thus, after Piper, an enhancement which neither expressly authorizes vicarious liability nor expressly includes a `personally' limitation is read to apply only to defendants who personally engage in the proscribed conduct." (People v. Gutierrez (1996) 46 Cal.App.4th 804, 814, 54 Cal.Rptr.2d 149, fn. omitted.) That is the case here. In reviewing the pertinent language, we conclude there is no express authorization for vicarious liability application of the greater punishment of a life sentence under section 664, subdivision (a). The language is at best ambiguous regarding any legislative intent to apply the greater base term to aiders and abettors and, under the weight of authority, suggests otherwise.
The statute provides that "if the crime attempted is willful, deliberate, and premeditated murder, as defined in Section 189, the person guilty of that attempt shall be punished by imprisonment . . . for life. . . ." (§ 664, subd. (a), emphasis added.) As previously explained, under Bright, "the crime attempted" is attempted murder with an additional finding, though not an element of the crime, that the attempted murder was willful, deliberate and premeditated. Further, as we have noted, the use of the phrase "the person" indicates personal and not vicarious application of the statute. (People v. Rener, supra, 24 Cal.App.4th at p. 266, 29 Cal.Rptr.2d 392 ["we identify] `person' and `personally' as accepted words of legal art meaning direct, not vicarious liability"]; People v. Rodriguez (1990) 219 Cal.App.3d 688, 693, 268 Cal.Rptr. 581 ["The Legislature's election not to use accepted words of legal art . . . is an unequivocal signal the prior convictions need not have resulted from the defendant's directly culpable conduct"]; see also People v. Manners (1986) 180 Cal.App.3d 826, 832, 225 Cal.Rptr. 798 [statutory language failed to clearly suggest vicarious liability but legislative history indicates the intent was to apply the statutory provision vicariously]; People v. Culbertson (1985) 171 Cal.App.3d 508, 514-515, 217 Cal.Rptr. 347 [the age differential specified in § 288a, subd. (c) ("Any person who participates in an act of oral copulation with another person who is under 14 years of age and more than 10 years younger than he or she . . .") refers to the ages of the two people who physically engage in the act of oral copulation, not the age of an aider and abettor].)
Of course, the trilogy of Supreme Court cases discussed above (Walker/Cole/Piper) all involved the "any person" language and all concluded this evidenced a legislative intent of personal and not vicarious liability. Further, the weight of intermediate appellate authority from other districts is also in accord. (See People v. Gutierrez, supra, 46 Cal.App.4th at p. 814, 54 Cal. Rptr.2d 149 ["after Piper, an enhancement which neither expressly authorizes vicarious liability nor expressly includes a `personally' limitation is read to apply only to defendants who personally engage in the proscribed misconduct"]; In re Jose D. (1990) 219 Cal.App.3d 582, 587, 268 Cal. Rptr. 364 [the language of § 12022.55 "focuses *424 upon the person who `inflicts' (injury) or `causes' (death) as a result of `discharging' a firearm [and thus] reasonably implies the personal discharging of the firearm"]; People v. Ramirez (1987) 189 Cal.App.3d 603, 627, 236 Cal.Rptr. 404 ["While section 12022.8 could be more explicit, the reference to `any person who inflicts great bodily injury' implies personal infliction, and the Legislature's failure to use the word `personally' does not amount to a direction to impose derivative liability"] fns. omitted; People v. Reed (1982) 135 Cal.App.3d 149, 151, 185 Cal. Rptr. 169 [the language of § 12022.3 ("any person shall receive an enhancement . . . if such person uses a firearm [or] if such person is armed with a firearm") applies only to one who is personally armed with a firearm].)
People v. Le (1984) 154 Cal.App.3d 1, 200 Cal.Rptr. 839, which applied a contrary rule for determining legislative intent, was criticized in People v. Piper, supra, 42 Cal.3d at page 477, footnote 5, 229 Cal.Rptr. 125, 722 P.2d 899, for failing to apply the Walker case.
As we have observed in Rodriguez and Rener, "the Legislature knows how to limit and to impose vicarious liability. Had it wanted to impose vicarious liability, it could have done so expressly as it did [in other statutes]." (People v. Rener, supra, 24 Cal.App.4th at p. 267, 29 Cal.Rptr.2d 392.) The language under consideration was added to section 664 after Walker. "And, unlike the case in People v. Manners, supra, 180 Cal.App.3d at p. 826, 225 Cal.Rptr. 798, we have not been shown that the legislative history of section [664, subdivision (a)] discloses an intention to encompass vicarious liability." (24 Cal.App.4th at p. 267, 29 Cal.Rptr.2d 392.)[6] Therefore, absent evidence and a finding that the person aiding and abetting the attempted murder personally did so willfully, with deliberation and premeditation, we hold the greater penalty provision may not be applied vicariously. This does not lead to absurd results as expressed in Laster. The Legislature could rationally conclude that an actual perpetrator attempting to commit a willful, deliberate and premeditated murder is deserving of a greater sentence than a person who knowingly aided the perpetrator in a dangerous criminal enterprise without knowledge of or concurrence in the perpetrator's plan of willful deliberate murder.

2. Harmless error
In this case, the prosecutor's theory as to both shootings was that both defendants were actual perpetrators of the crimes, and each personally fired their firearms. As a fallback position, the prosecutor argued that even if defendants did not personally use a firearm in the commission of the crimes, they were guilty as aiders and abettors. She further explained that she did not have to prove whose bullet hit which victim.
"I can't tell you who shot what. We know there were three shooters because we have three casings and we have three perpetrators, two of which are here. But I can't tell you which of the three had the nine-millimeter, which of the three had the .25, which of the three had the .38. I can't tell you that. There's no way. The evidence simply does not show us that. But it's not required for you to find the defendants guilty of the attempted murder and the murders later on Valeria if they shared the same intent as the actual perpetrator."
The jury was instructed on principles of aiding and abetting. The jury was not, however, instructed that to find true the allegation under section 664, subdivision *425 (a), each defendant personally was required to have acted willfully, deliberately and premeditatedly. Instead, the jury was instructed that "[t]o constitute willful, deliberate, and premeditated attempted murder, the would-be slayer must weigh and consider the question of killing and the reasons for and against such a choice...." (See CALJIC No. 8.67.) No additional instruction informed the jury regarding accomplice liability that "the would-be slayer[`s]" accomplice must also have weighed and considered the question of killing, and still decided to aid and abet the would-be slayer in the "direct but ineffectual attempt to kill another human being." (Ibid.) Under the analysis previously discussed, this was error.
"The failure to instruct the jury on all elements of a statute imposing a sentence enhancement is prejudicial `only where it is reasonably probable that a result more favorable to the defendant would have been reached in the absence of the error.' (People v. Wims (1995) 10 Cal.4th 293, 298 [41 Cal.Rptr.2d 241, 895 P.2d 77].) On review, we examine the entire record, including the facts, instructions, arguments of counsel, communications from the jury during deliberations, and the entire verdict. (Id. at p. 315 [41 Cal.Rptr.2d 241, 895 P.2d 77].)" (People v. Gutierrez, supra, 46 Cal.App.4th at p. 815, 54 Cal.Rptr.2d 149.)
Under the circumstances here, it is not reasonably probable that defendants would have received a more favorable result in the absence of the error. (People v. Watson, supra, 46 Cal.2d at p. 836, 299 P.2d 243.) The jury found both defendants personally used a firearm in the Valeria Street shootings and that Xiong personally used a firearm in the Burns Street shootings, of which Lee was acquitted. Further, the evidence in both shootings pointed undisputedly to planning and premeditation by the shooters. Once the identification issue was resolved, it was "a slam dunk" case for willful, deliberate and premeditated murders, except for the fact the victims did not all die. There clearly was no miscarriage of justice as a result of the instructional error. Further, as to the victims who did die, defendants concede the jury was properly instructed that it had to "`find that the killing was preceded and accompanied by a clear, deliberate intent on the part of the defendant to kill, which was the result of deliberation and premeditation. . . ."' There is no basis for concluding that defendants planned and premeditated the murders of Blong and Sandy but not the other victims who were shot at and struck in the same manner. Even applying the federal constitutional standard of error, we conclude the error was harmless beyond a reasonable doubt in this case, for the reasons noted above. (Apprendi v. New Jersey (2000) 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435; Chapman v. California (1967) 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705.)

F. The trial court did not abuse its discretion by failing to consider and rule on defendant Xiong's motion for a new trial.[]

G. The court did not err by staying the effect rather than striking the special circumstance of multiple murders.
Defendant Lee contends the court should have stricken the multiple murder special circumstance (§ 190.2, subd. (a)(3)), which was found true by the jury. Defendant, however, did not preserve this issue for appeal, and it is waived. Defendant's contention also fails on the merits and, in any event, any error is harmless.
After the verdicts were rendered, Lee's counsel filed a written "motion to preclude imposition of life without the possibility of parole." The basis for the motion was that Lee was 14 years old at the time he committed the offenses of which *426 he was convicted. The probation department had recommended sentences of life without the possibility of parole (LWOP) on the murder convictions. However, section 190.5 made no provision for application of an LWOP sentence for minors under 16. The motion concluded: "Because Phia Lee was fourteen at the time of the crimes, the law would prohibit his being sentenced to life without possibility of parole."
At sentencing, the court noted the prosecutor had conceded the issue. Defense counsel argued that "with regard to 14 and 15-year-olds, since there's no specific authorization, it would appear, although there's no explicit statement anywhere, that individuals at that age are simply too young to suffer that type of punishment no matter how severe the crime is." Defense counsel concluded: "Mr. Lee, an individual who was 14 at the time, cannot be punished for a crime without the possibility of parole. The district attorney's conceded it." The court granted the motion and noted it would inure to the benefit of Xiong as well. The prosecutor, Lisa Gamoian, then made a record of her position on the matter.
"MS. GAMOIAN: 190.5 is very, very clear on its face. By that it just affects punishment possible. It does not mean at all that the special is stricken. The special still remains as found true.
"THE COURT: Correct. I understand and I agree. I think that the literal reading of the code applies to people 16 years old or older at the time of the crime, and I think that's what you concluded.
"MS. GAMOIAN: Yes."
Contrary to Lee's contention on appeal, he at no time "moved to strike the special circumstance . . . ." Even after the prosecutor made her position clear, Lee never urged anything other than that he could not be sentenced to LWOP, and did not object to the court's agreement with the prosecutor's position. As a result, Lee's sentencing error contention, made for the first time on appeal, is not cognizable. (People v. Scott (1994) 9 Cal.4th 331, 351-353, 36 Cal.Rptr.2d 627, 885 P.2d 1040.)
Lee also argues that by simply staying the effect of the special circumstance rather than striking it, the court imposed an unauthorized sentence. Lee cites Newberry v. Superior Court (1985) 167 Cal.App.3d 238, 213 Cal.Rptr. 129 to support this position.[7] However, Newberry does not support his contention. That case did not involve sentencing error at all. There, Newberry filed a petition for writ of prohibition to restrain the superior court from further proceedings on special circumstances alleged in the information. The superior court was directed to strike one of the two alleged special circumstances because the facts could not support it under Supreme Court authority limiting its application.
Here, the facts support a special circumstance of multiple murder. Thus, Newberry does not support striking this jury finding, which is supported by the evidence. Nor, as noted earlier, can Newberry support a claim of unauthorized sentence since "an opinion is not authority for a proposition not therein considered." (Ginns v. Savage (1964) 61 Cal.2d 520, 524, fn. 2, 39 Cal. Rptr. 377, 393 P.2d 689.) Finally, Lee received an authorized sentencetwo terms of 25 years to life under section 190, subdivision (a).
To forestall a claim of ineffective assistance of counsel for failure to file a motion to strike the special circumstance, we find Lee has failed to articulate any prejudice from the alleged error, and *427 therefore a claim of ineffective assistance of counsel fails. The familiar standard for review of these claims is that defendant must show (1) trial counsel failed to act in a manner to be expected of reasonably competent attorneys, and (2) it is reasonably probable that a more favorable result would have been obtained absent counsel's failings. (People v. Lewis (1990) 50 Cal.3d 262, 288, 266 Cal.Rptr. 834, 786 P.2d 892.) When a defendant cannot establish the second prong of this test, it is unnecessary to first consider whether counsel's performance was deficient. (People v. Cox (1991) 53 Cal.3d 618, 656, 280 Cal.Rptr. 692, 809 P.2d 351.) Since the evidence supports the jury's finding that the special circumstance was true, and since defendant received an authorized sentence, he has suffered no prejudice from the court's failure to strike the jury finding. He has articulated no prejudice and we fail to see any. Since we do not engage in idle acts, we reject defendant's request to strike the special circumstance finding.

H. Defendant's prison sentence is not cruel and unusual punishment.
Defendant contends the lengthy prison sentence the trial court imposed for two first degree murders, three attempted murders with premeditation and deliberation, and firearm use enhancements is tantamount to a life sentence without the possibility of parole because he will be 91 when he first becomes eligible for parole. He argues the sentence constitutes cruel or unusual punishment as applied to him because it is grossly disproportionate to the offenses he committed. We reject this claim.
A sentence may violate article I, section 17, of the California Constitution if it is so disproportionate to the crime for which it is imposed that it "shocks the conscience and offends fundamental notions of human dignity." (In re Lynch (1972) 8 Cal.3d 410, 424, 105 Cal.Rptr. 217, 503 P.2d 921.) When applying the Lynch test for disproportionality, a court considers certain factors: 1) the degree of danger the offender or the offense pose to society; 2) how the punishment compares with the punishments for more serious crimes in the same jurisdiction; and 3) how the punishment compares with punishment for the same offense in other jurisdictions. (In re Lynch, supra, 8 Cal.3d at pp. 425-427, 105 Cal.Rptr. 217, 503 P.2d 921.)

1. Offense and offender
Defendant focuses on his lengthy sentence, equates it with life imprisonment without the possibility of parole, and condemns it. In doing so, he ignores the overriding concern for public safety. However, one person's burden is another's security. A person viewing defendant's sentence solely as punishment only sees half the picture. The offenses committed by defendant in this case, at a minimum, cry out for a long period of confinement to protect the residents of a civilized society. But Since defendant did not receive the death penalty or a true sentence of life without the possibility of parole, his sentence does not violate the spirit of section 190.5, subdivision (b). To the contrary, it embraces it. As noted in People v. Davis (1981) 29 Cal.3d 814, 832, footnote 10, 176 Cal.Rptr. 521, 633 P.2d 186: for defendant's youth, his crimes easily merit the ultimate penalty of death.
"[T]he difference in time is less significant than the difference in effect on the human spirit. `Life in prison [without the possibility of parole] is unique, . . . and it . . . differs in kind from all other, lesser sentences of imprisonment, including a sentence of life imprisonment with a fixed parole-eligibility date.' [Citation.]"
The offenses committed in this case are the most serious ones a person can commit, and pose the greatest degree of danger to society. The prosecutor's summary at the sentence hearing bears repeating here. "[Defendants] took aim and killed *428 young, innocent people just outside their own homes, trapped like animals."
". . . Sandy Vang, who died as a result of the gunshot wounds, was struck three times; Blong Xiong was struck once at a very critical place; and Quang Minh Ha as well in the throat and in the shoulder; Doua Vang and Linda Vang were struck each once.
"These victims were in the sanctuary of their homes. If you can't feel safe outside your door playing basketball with kids, you can't feel safe anywhere. This is truly appalling. There was nowhere to go. It was like shooting ducks in a barrel. It was a very small area, fenced in, at close-range, firing numerous times and striking critical areas."
Defendant notes he was only 14 at the time of his offenses and then observes "[h]e had no adult prior convictions." On the plus side of the ledger we thus have no prior adult convictions. On the other hand, however, there is the fact defendant had three prior juvenile adjudications: a burglary adjudication for stealing a bicycle at the age of 12; an adjudication for being in possession of a sawed-off rifle at the age of 13; and shortly after his 14th birthday, defendant's parents reported that he was out of control, having made threats of great bodily injury to them and having pointed a gun at his brother's head while threatening his life if he reported defendant's gang affiliation to the probation department.
On balance, we conclude defendant poses a high degree of danger to society. A comparison of other cases also leads to the conclusion that "[i]t was [defendant's] conduct, not his sentence, that was cruel and unusual." (People v. Wallace (1993) 14 Cal.App.4th 651, 666, 17 Cal.Rptr.2d 721 [non-strikes sentence of 283 years and 8 months not cruel or unusual].) "An examination of the nature of the offenses committed here . . . reveals that they are the most serious, violent and heinous crimes imaginable both in the abstract and in the real world." (People v. Huber (1986) 181 Cal.App.3d 601, 633, 227 Cal.Rptr. 113 [non-strikes sentence of 106 years and 4 months not cruel or unusual].) "In view of the outrageous nature of this type of offense and in view of the danger that these offenses pose to society we cannot say that the imposition of consecutive sentences for multiple sex offenses shocks the conscience and offends fundamental notions of human dignity." (People v. Bestelmeyer (1985) 166 Cal.App.3d 520, 531, 212 Cal.Rptr. 605 [while non-strikes sentence of 129 years may be the equivalent of a life sentence without the possibility of parole, it was not cruel or unusual for violent sex offender]; see also People v. Brown, (1994) 28 Cal. App.4th 591, 601, 33 Cal.Rptr.2d 678 [full consecutive terms for eight rapes instead of one where defendant kept re-penetrating the victim because she would not stay still and resulting in sentence of 107 years was proper].)
Defendant's reliance on People v. Dillon (1983) 34 Cal.3d 441, 194 Cal.Rptr. 390, 668 P.2d 697 is misplaced. "This was not the impulsive act of a frightened teenager against an armed criminal. This was a coldly premeditated crime where the participants had plenty of time to reflect on the consequences of their actions." (People v. Ortiz (1997) 57 Cal.App.4th 480, 486, 67 Cal.Rptr.2d 126; People v. Guinn (1994) 28 Cal.App.4th 1130, 1147, 33 Cal. Rptr.2d 791 [LWOP for 17-year-old not cruel or unusual "given the social reality of the many horrendous crimes, committed by increasingly vicious youthful offenders"].)
As we stated in People v. Ingram (1995) 40 Cal.App.4th 1397, at pages 1415-1416, 48 Cal.Rptr.2d 256 (disapproved on other grounds in People v. Dotson (1997) 16 Cal.4th 547, 560, fn. 8, 66 Cal.Rptr.2d 423, 941 P.2d 56):
"Defendant is precisely the type of offender from whom society seeks protection.... There is no indication defendant desires to reform or to change his criminal behavior. The record reflects an individual who [kills] innocent *429 people. . . . [¶] . . . [¶] Fundamental notions of human dignity are not offended by the prospect of exiling from society those individuals who have proved themselves to be threats to the public safety and security. Defendant's sentence is not shocking or inhumane in light of the nature of the offense and offender." (Fn. omitted.)

2. Punishment for more serious crimes in California
Defendant makes no comparison of his punishment to other punishment for serious crimes in California. His confederate, defendant Xiong, also a minor, received a longer sentence based on his additional convictions of attempted murder. Thus, defendant has not met his burden to demonstrate that the challenged punishment is more extreme than the punishment for more serious crimes in the same jurisdiction, (In re Lynch, supra, 8 Cal.3d at p. 426, 105 Cal.Rptr. 217, 503 P.2d 921; see In re DeBeque (1989) 212 Cal.App.3d 241, 254-255, 260 Cal.Rptr. 441.)

3. Punishment for similar offenses in other jurisdictions
Similarly, defendant has failed to meet his burden of showing the challenged punishment is more extreme than the punishment for the same crimes in other jurisdictions with recidivist statutes. Therefore, his disproportionality argument is rejected.

DISPOSITION
Under the power granted in section 1260, we reduce the attempted murder convictions in count four (Linda Vang) as to both defendants to convictions for a violation of section 245, subdivision (a)(2), and remand for resentencing. In all other respects, the judgments are affirmed.
DIBIASO, Acting P.J., and THAXTER, J., concur.
NOTES
[*] Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of Parts I-A, I-C, and II-A, B, C, and F.
[1] All statutory references are to the Penal Code unless otherwise noted.
[**] See footnote *, ante.
[***] See footnote *, ante.
[4] Conversely, if the evidence in Suesser was sufficient to constitute an attempt on Allen's life, the evidence here would likewise be sufficient to constitute an attempt on Troy's life.
[5] At the time of the offenses, section 664, former subdivision (a) provided that:

"Every person who attempts to commit any crime, but fails, or is prevented or intercepted in the perpetration thereof, is punishable, where no provision is made by law for the punishment of such attempts, as follows:
"(a) If the offense so attempted is punishable by imprisonment in the state prison, the person guilty of that attempt is punishable by imprisonment in the state prison for one-half the term of imprisonment prescribed upon a conviction of the offense so attempted; provided, however, that if the crime attempted is willful, deliberate, and premeditated murder, as defined in Section 189, the person guilty of that attempt shall be punishable by imprisonment in the state prison for life with the possibility of parole; provided, further, that if the crime attempted is any other one in which the maximum sentence is life imprisonment or death the person guilty of the attempt shall be punishable by imprisonment in the state prison for a term of five, seven, or nine years. The additional term provided in this section for attempted willful, deliberate, and premeditated murder shall not be imposed unless the fact that the attempted murder was willful, deliberate, and premeditated is charged in the accusatory pleading and admitted or found to be true by the trier of fact." (Stats. 1994, ch. 793, § 1)"
[6] We grant defendant Xiong's request to take judicial notice of the legislative history for the increased punishment for willful, deliberate and premeditated attempted murder. We have reviewed the materials and find there is nothing in the history that supports a legislative intent to apply this punishment to persons guilty of the attempted murder solely as aiders and abettors who did not share the required mental state of the perpetrator.
[] See footnote *, ante.
[7] Lee also cites section 1385.1. However, that section defeats rather than supports his argument. It states: "Notwithstanding Section 1385 or any other provision of law, a judge shall not strike or dismiss any special circumstance which is admitted by a plea of guilty or nolo contendere or is found by a jury or court as provided in Sections 190.1 to 190.5, inclusive."