Filed 7/7/23  P. v. Rivas CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JOAQUIN ARMANDO RIVAS,<br><br>    Defendant and Appellant. | B317059<br><br>(Los Angeles County<br>Super. Ct. No. BA488711) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Drew E. Edwards, Judge.  Affirmed in part, vacated in part, and remanded.

Alex Green, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Scott A. Taryle and Rene Judkiewicz, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant Joaquin Armando Rivas kidnapped victim Jacqueline T. and repeatedly sexually assaulted her. A jury convicted him of forcible oral copulation, rape, sodomy, sexual penetration, and kidnapping. The trial court sentenced him to 250 years to life. On appeal, Rivas challenges the trial court's exclusion of impeachment evidence, the sufficiency of the evidence supporting one of the forcible oral copulation counts, the trial court's refusal to instruct the jury on two lesser sodomy offenses, and the trial court's imposition of consecutive sentences under the One Strike law (Pen. Code, § 667.61).[1] We agree that the trial court erred in imposing ten consecutive sentences under the One Strike law and remand for resentencing. In all other respects, we affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

### I. Facts

#### A. *Rivas kidnaps Jacqueline*

At around 9:00 p.m. on July 17, 2020, Jacqueline was on her way to a local market when she passed Rivas, who approached her and struck up a conversation. Rivas offered to give Jacqueline a ride to the market, which she accepted. However, after first stopping at a liquor store, Rivas began driving in the wrong direction. Jacqueline grew worried. She told Rivas to pull over to let her out. Instead of pulling over, Rivas grabbed Jacqueline by the hair and placed a rag smelling of ammonia over her face. She lost consciousness.

---

[1] All undesignated statutory references are to the Penal Code.

2

**B.** *Sexual assaults*

*First couch*

When she awoke, Jacqueline was lying naked on a couch with zip ties around her neck and arms in such a way that if she lowered her arms, the zip tie around her neck would tighten. Rivas was yelling at her and hitting her. He "[f]lip[ped her] over on [her] knees near the couch on the floor." He placed his hands around her neck and on her mouth. Jacqueline struggled while on her knees, with her face in the couch. As Rivas held her down from behind, Jacqueline felt around on the couch for anything she might use to defend herself. She grabbed her torch lighter and burned Rivas. He then hit her in the temple and on the side of her face. He proceeded to choke Jacqueline for "[m]inutes" until she "lost [control of her] bowels," "peed all over," and "los[t] consciousness." When she regained consciousness, Rivas inserted something into her vagina "a couple of times," but she "d[idn't] know what it was."

*Second couch*

Rivas then grabbed Jacqueline by the hair and dragged her to another couch in the living room. He replaced or adjusted the zip ties around her neck and arms. He forced her on the floor, bent her over, had sex with her "vaginally and anally, and flipped [her] over and ha[d] it vaginally." The zip ties crushed Jacqueline's windpipe and suffocated her until she urinated again.

*Bedroom*

At some point, Rivas "got mad," grabbed Jacqueline by the hair, and "dr[agged her] to the bedroom." He threw her onto the bed, told her not to move, and left the room. While he was gone, Jacqueline—still zip tied—managed to grab a small pair of green

3

scissors from a backpack she saw hanging in the bedroom closet. She hid the scissors in the "back of [her] hair" and returned to the bed. Rivas returned soon after and proceeded to "hav[e] sex with [her] as many ways as he . . . saw fit," vaginally, anally, and orally. He penetrated her vagina and her anus with his penis. Putting his penis in her mouth was "one of the last things he did" on the bed. While she was lying on the bed with her head hanging over the edge, Rivas stood over her, pulled her hair back, and forced his penis into her mouth "[s]everal times, just like he put his penis everywhere else several times." Jacqueline repeatedly turned her head "to protect the back of [her] throat." Rivas repeatedly told her to stop turning her head, but she "turned [her] head anyway." According to Jacqueline, Rivas broke her tooth and tore the skin under her tongue.

C. *Escape*

Jacqueline again lost consciousness and later "woke up in [her] own excrement." Rivas was asleep. Jacqueline took the scissors out of her hair and cut one hand free. She also cut off an ankle monitor she was wearing, and slipped it under the box spring of the bed with the hope that law enforcement would locate and save her.[2] When Rivas woke up, she told him, " '[p]lease let me pee,' " and he dragged her to the bathroom. Rivas allowed Jacqueline to wash off. He poured buckets of water on her in the bathtub. The home lacked running water except for a faucet on the front porch. Rivas told Jacqueline "it

---

[2] As discussed in further detail below, Jacqueline testified that she was convicted of a felony in November 2020. Prior to the conviction, and at the time of the incident, she was released on her own recognizance and was required to wear an ankle GPS monitor as a condition of her release.

4

would be over for [her] soon," instructed her not to move, and left the bathroom.

As soon as Rivas left, Jacqueline left the bathroom and found a door to exit through the back of the house. On her way out, she grabbed clothes that were sitting on a sink and put them on as she ran away. She ran down the driveway, four houses down the street, and hid in a yard, behind a hedge. It was about 6:30 a.m. on July 18, 2020. She knocked on the windows of the house next to where she was hiding, but no one responded. She dozed off due to "an adrenaline dump after everything [that had] happened."

Jacqueline emerged from the bushes at 9:30 a.m. She made her way to Western Avenue, a major thoroughfare, where she tried to flag down three different police vehicles. With no success and no phone, Jacqueline returned to her friend's RV, where she hid until nighttime. After nightfall, Jacqueline located an acquaintance who let her use his phone to call 911.

**D. *Investigation***

*Jacqueline's physical examination*

Jacqueline was examined at a rape treatment center on the morning of July 19, 2020. Although her neck was not visibly injured, she complained of "difficulty swallowing," which was "consistent with somebody who has been strangled." She also had pain in her throat and all over her body, including vaginal and anal pain. Her eyes were bloodshot from burst blood vessels, or "petechiae," which was also consistent with strangulation. She had bruises on her upper cheek and along the top of her "eyelid area," consistent with strangulation or blunt force trauma to the face, "like being punched in the face." Petechiae were also present underneath her tongue and in the back of her throat,

5

consistent with blunt force trauma and forced oral copulation. She reported tasting blood in her mouth during the attack and thought her tooth may have cut Rivas's penis. She had "multiple little lacerations to [her] fingers," bruises on both wrists, and an abrasion on her wrist from the "top layer of the skin ha[ving] been sheared off."

Jacqueline also suffered vaginal injuries. She had a bruised inner labia, consistent with blunt force trauma to the vaginal area. She also had a laceration in the vaginal canal that was consistent with "something cutting the inside of [her] vagina."

Jacqueline had "some possible bruising" inside her anus, but the examining nurse did not label it an injury because she was not "100 percent sure" given that the anus "can have differences in coloration." The nurse practitioner explained at trial that "[s]ometimes bruising and musculoskeletal injuries won't show up for a few days," such that "patients will develop more bruises after . . . they come see us."

Jacqueline tested positive for amphetamines, cannabinoids, and opiates. At trial, she admitted smoking meth in the two days before she met Rivas, and again when she returned to the RV after her escape.

*Rivas's physical examination*

After his arrest, law enforcement took Rivas for examination at the rape treatment center. When asked about any genital injuries, Rivas told the nurse he had none. The nurse, however, found three fresh scratches or abrasions on the head of his penis. Such abrasions could be caused by something hard enough to scrape and remove the top layer of skin, including a tooth. Rivas also had an abrasion on his upper right clavicle.

6

*Biological and other physical evidence*

The examining nurses took various swabs from Jacqueline and Rivas during their rape examinations. The vaginal swab from Jacqueline contained sperm, but insufficient DNA to determine whether it belonged to Rivas. Sperm was also detected in the cervical swab, but the male DNA present could not be analyzed. No sperm was detected in the anal swab. Although the anal swab was " 'male DNA inclusive,' " it did not produce results that could be interpreted. No DNA or sperm was detected in the rectal swab. The swab taken from Jacqueline's mons pubis contained male DNA that was incomplete, but largely consistent with Rivas's DNA.

During a pre-booking search, law enforcement found a piece of a zip tie in the pocket of Rivas's pants. His car contained "gloves, bottles, water bottles with liquids in them, [and] rags." When investigators searched Rivas's home, fans were blowing, sheets covered the windows and couches, and plastic covered the countertops in the kitchen. Bottles filled with liquid and a bag of cloth sat on a table. There were "cleaning materials throughout the house," as well as zip ties of multiple sizes.[3] Buckets of water surrounded the bathtub. The search also yielded a pair of green scissors and a backpack hanging in the bedroom closet. Blood and semen stained Rivas's sheets and pillowcase.

---

[3] At trial, the owner of the house testified that Rivas was helping renovate the property. Zip ties and other construction materials were there for their work. The owner further testified that at the time of the incident, Rivas was working in food safety and had cleaning supplies he used to teach classes about proper cleaning methods, and for making hand sanitizer.

Although law enforcement did not find Jacqueline's ankle monitor in Rivas's house, the monitoring system reported the device was near the home on July 18, 2020, and showed the same coordinates on July 21, 2020. Surveillance cameras at the liquor store and neighboring homes captured footage that corroborated Jacqueline's account and the sequence of events.

## II.    Procedural Background

The People charged Rivas with three counts of forcible rape (§ 261, subd. (a)(2); counts 1-3); three counts of forcible oral copulation (§ 287, subd. (c)(2)(A); counts 4-6); three counts of forcible sodomy (§ 286, subd. (c)(2)(A); counts 7-9); one count of sexual penetration by force (§289, subd. (a)(1)(A); count 10); and one count of kidnapping to commit rape (§ 209, subd. (b)(1); count 11). For counts 1 through 10, the People alleged that Rivas suffered a prior sex conviction within the meaning of section 667.6, subdivision (a). The People also asserted special allegations under the One Strike Law, namely that Rivas kidnapped Jacqueline within the meaning of section 667.61, subdivisions (d)(2) and (e)(1), and that he tied or bound her in the commission of the charged offenses (§ 667.61, subd. (e)(5)).

A jury found Rivas guilty on all counts and found all allegations true. The trial court imposed an aggregate sentence of 250 years to life in prison, consisting of consecutive 25-years-to-life sentences on counts 1 through 10. The court imposed but stayed a seven-year sentence on count 11. On the People's motion, the court dismissed prior strike enhancements under sections 1170.12 and 667.6, subdivision (a).

Rivas timely appealed.

8

## DISCUSSION

## I. The Trial Court Did Not Err in Excluding Evidence of Criminal Charges Pending Against Jacqueline

Rivas contends the trial court prejudicially erred and violated his constitutional confrontation and due process rights in excluding evidence that Jacqueline had felony charges pending against her. We review the trial court's ruling for abuse of discretion and find no error. (*People v. Caro* (2019) 7 Cal.5th 463, 503; *People v. Peoples* (2016) 62 Cal.4th 718, 743.)

### A. Background

Rivas sought to impeach Jacqueline with evidence of prior convictions involving moral turpitude, and evidence of pending charges arising from allegations that she broke into a hotel room, stole the occupant's car keys, and was found driving the occupant's car. The People opposed any mention of the pending matter. The trial court allowed Rivas to elicit evidence of Jacqueline's prior convictions but not the pending charges. At trial, Jacqueline admitted suffering misdemeanor convictions for fraud and theft offenses in 2009, 2018, and 2020. She further admitted that she was convicted of receiving stolen property, a felony, in November 2020. She testified that when she encountered Rivas in July 2020, she was wearing an ankle monitor in connection with the case that eventually resulted in the November 2020 conviction.

### B. Discussion

Under Evidence Code section 352, a trial court has broad discretion to "exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create a substantial danger of undue prejudice, of confusing the issues, or

9

of misleading the jury." (Evid. Code, § 352; *People v. Linton* (2013) 56 Cal.4th 1146, 1181; *People v. Smith* (2007) 40 Cal.4th 483, 513.) This broad discretion applies equally to " 'exclusion of impeachment evidence in individual cases.' " (*Smith,* at p. 512; accord *People v. Rodriguez* (1999) 20 Cal.4th 1, 9–10.)

The trial court did not abuse its discretion. The probative value of the charges pending against Jacqueline was minimal. As the trial court reasoned, Jacqueline was presumed innocent of the pending charges. In the absence of a conviction, the evidence was relevant only if the allegations were established to be true. The trial court could reasonably conclude admitting the evidence would necessitate undue consumption of time and a substantial danger of undue prejudice. Attempts to impeach Jacqueline with evidence of the conduct underlying the pending charges would likely involve problems of proof, as well as the potential need for Jacqueline to invoke her right against self-incrimination. In light of the court's ruling allowing Rivas to attack Jacqueline's credibility by impeaching her with multiple prior convictions involving moral turpitude, the trial court could reasonably conclude that the probative value of the pending charges was substantially outweighed by the likelihood that admitting the evidence would necessitate an undue consumption of time and create a substantial risk of undue prejudice.

Rivas argues that the fact of the pending charges would have established Jacqueline's bias, and a motive to testify favorably for the prosecution to receive leniency. However, Rivas did not make this argument in the trial court and did not elicit or offer any evidence suggesting there was reason to believe that Jacqueline expected to receive leniency from her testimony. Unlike the defendant in *People v. Coyer* (1983) 142 Cal.App.3d

839, 842, Rivas was not seeking pre-trial discovery of pending charges. The defense had received information regarding the pending charges, and there was no request for discovery or further proceedings to explore whether Jacqueline expected to receive any benefit for her testimony. Any inference of bias from Jacqueline's pending charges would have been purely speculative. (*People v. Peoples, supra,* 62 Cal.4th at p. 743 [exclusion of evidence that produces only speculative inferences is not an abuse of discretion].)

As our high court explained in *People v. Brown* (2003) 31 Cal.4th 518, 545 (hereafter *Brown II*), while " '[c]ross-examination to test the credibility of a prosecuting witness in a criminal case should be given wide latitude' [citation], such latitude does not 'prevent the trial court from imposing reasonable limits on defense counsel's inquiry based on concerns about harassment, confusion of the issues, or relevance.' [citation]." As in *Brown II,* "we find the trial court did not abuse its discretion in concluding that, under Evidence Code section 352, any slight impeachment effect of the remote possibility the witness was testifying in hopes of leniency was outweighed by the undue consumption of time such questioning would entail. This routine application of state evidentiary law does not implicate defendant's constitutional rights." (*Ibid.*)

Moreover, even if the trial court erred in excluding evidence of Jacqueline's pending charges, we would find any error harmless. As Rivas asserts in his opening brief, "defense counsel's primary argument was that Jacqueline T. was an unreliable source of information." The defense was permitted to elicit evidence to that end, such as Jacqueline's prior convictions and evidence of her drug use.

11

Further, the evidence in this case was overwhelming, including the ample evidence corroborating Jacqueline's testimony. The injuries to Jacqueline's throat, eyes, wrists, vagina, and fingertips were consistent with strangulation, rape, and forcible oral penetration. She reported anal pain to the nurse who examined her, consistent with having been forcibly sodomized. Rivas had abrasions on the head of his penis consistent with scraping against teeth, injuries he initially denied having and subsequently could not explain. Surveillance videos from the liquor store and from neighboring homes corroborated Jacqueline's account, as did the physical evidence recovered from Rivas's person, his home, and his car. Rivas's DNA was found on Jacqueline's mons pubis, and sperm and blood were found on his bedsheets.

In view of the quantity and quality of the evidence showing Rivas's guilt, as well as the admission of other evidence to impeach Jacqueline's credibility, it is not reasonably probable that a result more favorable to Rivas would have been reached had the trial court allowed evidence of the charges pending against Jacqueline. (*People v. Watson* (1956) 46 Cal.2d 818, 837; *People v. Cunningham* (2001) 25 Cal.4th 926, 999 [exclusion of defense evidence on a minor or subsidiary point does not interfere with constitutional rights].)

Rivas asserts a related ineffective assistance of counsel argument based on his trial counsel's failure to (1) specifically argue that the pending charges tended to show Jacqueline's motive to seek leniency through testifying, and (2) "press for a ruling" that exclusion of the evidence violated Rivas's right to confrontation. Our conclusion that no prejudice resulted from the exclusion of the pending charge necessarily includes the

12

conclusion that Rivas has not met his burden to show prejudice with respect to his related ineffective assistance of counsel claim. (*Strickland v. Washington* (1984) 466 U.S. 668, 687–688; *People v. Bell* (2019) 7 Cal.5th 70, 125.)

## II. Substantial Evidence Supports Rivas's Convictions on Three Counts of Forcible Oral Copulation

Rivas argues there is insufficient evidence to support a third count of forcible oral copulation because (1) the evidence "only fairly indicates that there was . . . one time frame during which [Rivas] forced her to orally copulate him," (2) Jacqueline testified that the forcible oral copulation was "one of the last things he did," and (3) the word "several," as used by Jacqueline to describe how many times Rivas forced his penis into her mouth, can also mean " 'more than one' " (and hence only two).[4] We find no merit in these arguments.

When reviewing a challenge to the sufficiency of the evidence, we view the evidence in the light most favorable to the judgment and ask whether " ' "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." ' " (*People v. Banks* (2015) 61 Cal.4th 788, 804, italics omitted.) "Because the sufficiency of the evidence is ultimately a legal question, we must examine the record independently for ' " substantial evidence—that is, evidence which is reasonable, credible, and of solid value" ' that would support a finding beyond a reasonable doubt." (*Ibid.*)

---

[4] Much of Rivas's argument concerns a misstatement by the prosecutor, which is not germane to our sufficiency-of-the-evidence analysis. (*People v. Redd* (2010) 48 Cal.4th 691, 727 [statements made by counsel are not evidence].)

Rivas contends that no rational factfinder could have found him guilty of three separate acts of forcible oral copulation because the oral copulation only occurred in the bedroom, such that "there was only one time frame during which [Rivas] forced [Jacqueline] to orally copulate him." Rivas fails to cite a single case to support this contention. Indeed, the case law squarely rejects it.

In *People v. Harrison* (1989) 48 Cal.3d 321 (*Harrison*), our Supreme Court held the defendant was properly convicted of three separate counts of digital penetration (§ 289) committed in the course of a seven- to 10-minute attack on the victim. The defendant broke into the victim's bedroom and inserted his finger into her vagina. She resisted, causing his finger to become dislodged, but he managed to reinsert his finger twice more. (*Id.* at p. 325.) The Court focused on the language in section 289 providing that the crime is committed by a " 'penetration, *however slight.*' " (*Id.* at p. 328.) The court reasoned that "all the elements of three 'completed' violations of section 289 were present" because the defendant's finger penetrated the victim three separate times, each time with the requisite intent, and each time employing the requisite degree of force or fear. (*Id.* at p. 329.) *Harrison* rejected a minority view—expressed in *People v. Hammon* (1987) 191 Cal.App.3d 1084, 1088—that similar sex acts constitute distinct crimes only where there is an " 'appreciable passage of time,' " a " 'reasonable opportunity for reflection,' " a transition to " 'a different sexual offense,' " or a " 'sexual climax.' " (*Harrison*, at pp. 332–333; accord *People v. Clem* (1980) 104 Cal.App.3d 337, 347 [each penetration was separate act of rape]; *People v. Marks* (1986) 184 Cal.App.3d 458, 466 [sodomy; same result].)

14

Courts have applied *Harrison*'s holding in various contexts, including where a "defendant's penis kept coming out of [the victim's] vagina" because she "was moving and defendant was hurting her." (*People v. Brown* (1994) 28 Cal.App.4th 591, 601 (hereafter *Brown I*) [affirming convictions on eight counts of rape where penis dislodged each time victim struggled]; *People v. Catelli* (1991) 227 Cal.App.3d 1434, 1446 [affirming two convictions of forcible oral copulation against each victim where defendant forced one girl to lick his scrotum and another to suck his penis, and then had them switch positions]; *People v. Johnson* (2007) 150 Cal.App.4th 1467, 1473–1474 [affirming three convictions for corporal injury on cohabitant based on " 'multiple blows' " during a " 'continuous assault' "]; *People v. Scott* (1994) 9 Cal.4th 331, 336, 345–347 [defendant's acts of fondling and intercourse with minor warranted separate convictions despite occurring on a single occasion].)

Similarly, substantial evidence supports all three convictions for forcible oral copulation in this case. Like the definitions of "penetration" for the crimes of rape, sodomy, and forcible digital penetration (§§ 263, 286, subd. (a), 289), "oral copulation" in violation of section 287 requires "any contact, *no matter how slight*, between the mouth of one person and the sexual organ . . . of another." (CALCRIM No. 1015, italics added; *People v. Grim* (1992) 9 Cal.App.4th 1240, 1242.) And like the crime of forcible rape, the crime of forcible oral copulation requires a contact " '*accomplished against the victim's will* by means of force.' " (*People v. Guido* (2005) 125 Cal.App.4th 566, 575, quoting *People v. Griffin* (2004) 33 Cal.4th 1015, 1027.)

Jacqueline testified that Rivas forced his penis into her mouth "several times, just like he did everything else several

15

times." She further testified that while Rivas was forcing his penis into her mouth, she kept turning her head despite his repeated instruction to stop doing so. It is reasonable to infer from this testimony that Rivas's penis became dislodged when Jacqueline turned her head and that he forcefully overcame her will by reinserting it "several times."[5] (*Brown I*, *supra*, 28 Cal.App.4th at p. 601 [struggle resulted in multiple dislodgments, each marking the completion of a separate sex crime].) Jacqueline told the jury that Rivas "tried to damage the back of [her] throat," and that his penis "broke [her] tooth" and "tore the skin that holds [her] tongue down . . . to the bottom of her jaw." Given the severity of the injuries Jacqueline described, a jury could reasonably conclude that Rivas made three forcible contacts between his penis and Jacqueline's mouth. Jacqueline's testimony alone provided substantial evidence supporting three convictions of forcible oral copulation. (*People v. Gammage* (1992) 2 Cal.4th 693, 700 [conviction of a sex crime may be sustained upon testimony of victim alone].)

We similarly reject Rivas's argument that his counsel was ineffective for failing to object to the prosecutor's erroneous statements describing *two* distinct times frames, separated by acts of rape, during which Rivas forced Jacqueline to orally copulate him.

In her closing argument, the prosecutor stated Rivas "forced [Jacqueline] to orally copulate him" in the living room, that he "raped her repeatedly . . . on the floor," and that "he [then] had her forcibly orally copulate him again while still on the

---

[5] Penetration is not required for forcible oral copulation (CALCRIM No. 1015; *People v. Huynh* (2012) 212 Cal.App.4th 285, 305), but it is certainly sufficient.

16

floor [of the living room]."  Jacqueline's testimony only specifically described oral copulation occurring in the bedroom. However, as explained above, whether the oral copulation occurred in bedroom or in the living room did not determine how many violations of section 287 occurred.  Nor is it reasonably probable that the prosecutor's mistaken reference to two distinct "time frames" divided by acts of rape impacted the jury's verdict. Had the mistaken reference to two discernable time frames informed the verdict, it would have resulted in convictions on two counts of oral copulation, not three.  In other words, that the jury convicted Rivas of three counts of forcible oral copulation shows that it is not reasonably probable that "but for [the unsupported reference to intervening acts of rape], the result of the proceeding would have been different."  (*People v. Williams* (1997) 16 Cal.4th 153, 215.)

The jury's verdict was consistent with the conclusion that Rivas made three forcible contacts between his penis and Jacqueline's mouth, rather than a reliance on there being two distinct periods of oral copulation.  We further note that the trial court admonished the jury that "[n]othing that the attorneys say is evidence."  (*People v. Sanchez* (1995) 12 Cal.4th 1, 70 [similar admonition "vitiated the misleading effect of" "the prosecutor's isolated mischaracterization of the evidence in her opening statement"], disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421 & fn. 22.)  Rivas has not established there is a reasonable probability that but for defense counsel's failure to object to any prosecutor misstatements, the outcome of the trial would have been different.

## III. The Trial Court Did Not Err in Refusing to Instruct the Jury on Assault with Intent to Commit Sodomy or Attempted Sodomy

Rivas argues the trial court erred in refusing to instruct the jury on the crimes of assault with intent to commit sodomy (§ 220) and attempted sodomy (§§ 664, 286). Rivas contends both crimes are lesser included offenses of sodomy (§ 286). The People assert the trial court properly rejected Rivas's request for an instruction because the crimes are not lesser included offenses of sodomy. We need not resolve this question. Even if assault with intent to commit sodomy and attempted sodomy are lesser included offenses of forcible sodomy, there was no substantial evidence that only those lesser crimes were committed.

" '[A] trial court must instruct a criminal jury on any lesser offense "necessarily included" in the charged offense, if there is substantial evidence that only the lesser crime was committed.' " (*People v. Smith* (2013) 57 Cal.4th 232, 239, quoting *People v. Birks* (1998) 19 Cal.4th 108, 112; accord *People v. Breverman* (1998) 19 Cal.4th 142, 154–155.) " ' "[I]f there is no proof, other than an unexplainable rejection of the prosecution's evidence, that the offense was less than that charged, [instructions on lesser included offenses] shall not be given." ' " (*People v. Friend* (2009) 47 Cal.4th 1, 52–53.) We independently review the question of whether the trial court failed to instruct on a lesser included offense. (*People v. Licas* (2007) 41 Cal.4th 362, 366; *People v. Cole* (2004) 33 Cal.4th 1158, 1218.)

"Sodomy is sexual conduct consisting of contact between the penis of one person and the anus of another person. Any sexual penetration, however slight, is sufficient to complete the crime of sodomy." (§ 286, subd. (a).) An attempt requires "a

18

specific intent to commit the crime, and a direct but ineffectual act done toward its commission." (§ 21a.)  Assault with intent to commit sodomy requires evidence of an assault and evidence that, at some time during the assault, the defendant intended to commit sodomy.  (*People v. Clifton* (1967) 248 Cal.App.2d 126, 129.)

Jacqueline unequivocally testified that Rivas "had sex with [her] . . . anally" multiple times, including after he dragged her to the living room floor and bent her over the couch while her arms were zip tied.  She specifically testified that Rivas penetrated her anally with his penis.  She later reported anal pain, and the rape examination revealed possible bruising inside her anus.  There was no evidence from which the jury could reasonably conclude that Rivas intended to commit sodomy, but only took a direct but *ineffective* step toward committing the act.  Similarly, there was no evidence from which the jury could reasonably conclude Rivas intended to commit forcible sodomy, he engaged in conduct sufficient to be an assault, but those actions fell short of penetrating contact between his penis and Jacqueline's anus. (*People v. Paz* (2017) 10 Cal.App.5th 1023, 1033 [sodomy does not require penetration past the anal verge or into the anal canal].) In the trial court, defense counsel argued a reasonable jury could find "an issue" regarding penetration or the "extent" or "type of touching" that occurred.  Yet, nothing in Jacqueline's testimony suggested that Rivas was unable to penetrate her anal opening, or that he was in any way impeded from doing so.[6]

---

[6] Jacqueline testified that at one point Rivas inserted an object into her anus.  Rivas suggests the inconclusive bruising, lack of DNA or sperm evidence from rectal or anal swabs, and the

19

Rivas argues the lack of his DNA and sperm on the swabs taken from Jacqueline's anus and rectum, and the lack of certainty with which the nurse noted possible bruising in Jacqueline's rectum, support his argument. Rivas also cites the evidence of Jacqueline's drug use to argue that her testimony "was not reliable." These arguments are misplaced. During the rape examination, the nurse took swabs "around the anus," as well as "inside the rectum." According to the criminalist, no sperm was detected on either the anal or rectal swabs, DNA was at a value too low from the anal swab to be analyzed and was therefore " 'male DNA inconclusive,' " and there was no male DNA detected from the rectal swab. This evidence, and the inconclusive evidence of rectal bruising, could have suggested Rivas engaged in no conduct inside or outside the anal opening sufficient to transfer his sperm or DNA, or to create bruises. It was not, however, substantial evidence of a theory that Rivas engaged in conduct that would establish an intent to commit sodomy, but he did not complete the act. Likewise, a general rejection of Jacqueline's testimony as not credible could have led the jury to conclude Rivas's guilt on the sodomy count was not established beyond a reasonable doubt. But there was no evidentiary basis for an alternative factual scenario that would allow the jury to accept portions of Jacqueline's testimony sufficient to conclude Rivas had the intent to commit sodomy,

---

unreliability of Jacqueline's testimony due to her drug use, could have led the jury to conclude Rivas anally penetrated Jacqueline with a foreign object only. However, this factual scenario, even if supported by the evidence, would not have provided substantial evidence of an *intent to commit sodomy*, an element necessary for both attempted sodomy and assault with intent to commit sodomy.

while simultaneously rejecting her testimony that he completed the act.

"' "[S]peculation is an insufficient basis upon which to require the giving of an instruction on a lesser included offense." ' [Citations.] '[T]he existence of "*any* evidence, no matter how weak" will not justify instructions on a lesser included offense. . . .' [Citation.] Rather, substantial evidence must exist to allow a reasonable jury to find that the defendant is guilty of a lesser but not the greater offense. [Citation.] ' " 'Substantial evidence is evidence sufficient to "deserve consideration by the jury," that is, evidence that a reasonable jury could find persuasive.' " ' [Citation.]" *People v. Valdez* (2004) 32 Cal.4th 73, 116.)

There was no substantial evidence that Rivas's relevant acts were anything other than sodomy, which is completed by penetration of the anal opening, however slight. Rivas has advanced no theory consistent with the evidence that would have allowed the jury to convict him of attempted sodomy or assault with intent to commit sodomy. Even if both crimes are lesser included offenses of sodomy by force, the trial court did not err in refusing to instruct on them, or in rejecting Rivas's motion for new trial on the same ground.

## IV.  Section 667.61, subdivision (i)

Rivas contends that the trial court erred in imposing consecutive sentences for counts 1 through 10 under section 667.61. The People concede that the evidence did not support more than three consecutive sentences under section 667.61.

At the sentencing hearing, the trial court stated Rivas was "being sentence[d] pursuant to Penal Code section 667.61 for

21

purposes of the One Strike Sentence Law." The court then imposed sentences of 25 years to life on counts 1 through 10, to be served consecutively.

Section 667.61, subdivision (i), mandates consecutive sentences for each of certain offenses resulting in convictions if the crimes involve the same victim on "separate occasions." (§ 667.61, subd. (i).) The parties agree, as do we, that the evidence could only reasonably show three "separate occasions" for the purpose of the One Strike law's mandatory consecutive sentencing provision (§ 667.61, subd. (i)). (*People v. Dearborne* (2019) 34 Cal.App.5th 250, 265–266.) However, the People urge that we nonetheless affirm the trial court's consecutive sentencing under section 667.6, subdivision (c), which gives the trial court discretion to impose consecutive sentences even if the crimes involve the same victim on the same occasion. (§ 667.6, subd. (c).) The People assert "nothing in the record affirmatively rebuts th[e] presumption" that "[the] court . . . understood its sentencing discretion."

The record does not support the People's argument. Both in their sentencing memoranda and at the sentencing hearing, the parties focused solely on the mandatory consecutive sentencing provision (§ 667.61, subd. (i)), and never once mentioned the discretionary provision (§ 667.6, subd. (c)). Further, in imposing the 10 consecutive 25-year-to-life sentences for counts 1 through 10, the court expressly cited the section 667.61 mandatory provision, and did not provide a statement of reasons that would have been consistent with 667.6, subdivision (c). (*People v. Osband* (1986) 13 Cal.4th 622, 729; Cal. Rules of Court, rule 4.426(b).) We vacate the sentence

22

imposed on counts 1 through 10 and remand for resentencing.[7] (*People v. Dearborne, supra,* 34 Cal.App.5th at pp. 266–267 [when record shows trial court sentenced on erroneous assumption it lacked discretion, remand necessary to allow court to exercise sentencing discretion at new hearing].)

## DISPOSITION

We vacate the sentence as to counts 1 through 10 and remand for resentencing.  In all other respects the judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

ADAMS, J.

We concur:

EDMON, P. J.

LAVIN, J.

---

[7] The parties also agree that the abstract of judgment failed to reflect certain fees and assessments the trial court imposed. Because we vacate the sentence and remand for resentencing we need not address this issue.